## Wilson D. Darlington et al.
## v.
## Thomas W. Chamberlain.

1. AGENCY—FACTOR OR BROKER—LIEN OF.—It seems to be well settled that agents doing business as usually conducted at the stock yards, have a lien on the stock coming to their possession to be sold by them for their principal, for general advances ; and this lien is not limited to property acquired with the money advanced, but it seems to extend to all property which comes to the agent's hands.

2. SAME—WAIVER OF FACTOR'S LIEN.—The right of the factor to hold the goods of his principal for an account due him, may be waived by the factor, and the waiver may be inferred from the manner of dealing between the parties.

3. SAME.—The court is of the opinion that the taking of judgment notes by the appellants, together with the course of dealing shown by the testimony, and the instructions given to appellants when receiving the property to sell, all constitute a waiver of any lien to which they might otherwise have been entitled.

APPEAL from the Circuit Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding. Opinion filed December 16, 1886.

This action was brought by appellee to recover from appellants the proceeds of the sale of certain cattle and hogs made by appellants' firm, as commission brokers, at the Union Stock Yards, in Cook county, for Holderman Bros., who were engaged in purchasing stock in the country about Pontiac, and also in the vicinity of Rantoul, Ill., and shipping the same to Chicago market for sale. Appellants had for many years acted as the factors or commission firm for Holderman Bros. in receiving and selling the live stock which they sent in, and from time to time made considerable advances to said Holderman Bros. to enable them to purchase feed and ship stock.

In the summer of 1883, advances to the amount of six thousand dollars were made on the request of Holderman Bros., which money was used in buying and feeding stock, and a portion thereof in paying off some old debts.    Judg-

ment notes were taken by appellants from Holderman Bros. for this advance. Something about twenty-six hundred dollars was paid on what was due to appellants out of the proceeds of cattle shipped, and they declined to keep on making advances for the Holderman Bros. unless the cattle were in the yards. The Holdermans then made an arrangement with appellee, who is a banker doing business at Rantoul, to furnish them money to pay for the stock they should purchase in Champaign county, they agreeing that as soon as the stock reached Chicago and was sold, the amount appellee advanced on each shipment should be placed by appellants, who were to be the commission brokers to sell the stock, to the credit of the appellee, in the Commercial National Bank of Chicago. Under this arrangement the appellee advanced to the Holdermans up to June, 1885, nearly every week, money to pay for stock purchased and ready to ship, and in all a sum amounting to nearly twenty-five thousand dollars. Appellants were aware that the Holdermans were getting money to buy the stock shipped to them to sell from appellee, and the course of business was for the Holdermans to ship the stock in their own names, and advise the appellants by telegraph or letter how much of the proceeds of the shipment they should place over to the credit of appellee. This course of business was pursued by appellants in dealing with the stock shipped by the Holdermans, and the directions of the Holdermans with regard to placing the proceeds of sale to the credit of appellee were observed until about July 1, 1885.

On June 30, 1885, appellee advanced to the Holdermans about four thousand dollars to purchase cattle and hogs, in pursuance of the course of dealing, and three car loads of cattle and one of hogs were shipped, and one of the Holderman brothers came up to Chicago with the stock, and saw one of the appellants before all of the stock was sold, and told him that the money for the stock was to be paid right over to the credit of appellee, telling him that the stock was purchased with money from appellee, and was given to understand that it would be done as soon as the stock was all sold. He then, before the stock was all sold, directed the proceeds to be paid

over to appellee, and went home to Rantoul. On July 2d, appellants telegraphed to Holderman Bros. that they had applied the proceeds of the sale of the shipment, amounting to $4,285.07 net, on the notes which they held against them, and therefore there was nothing to deposit for appellee. Appellee was not aware of the indebtedness of Holderman Bros. to appellants. There was a verdict against appellants for $3,330.11 and judgment, and the case is brought to this court by appeal.

Mr. Mason B. Loomis, for appellant; as to the lien of a factor for advances, cited Winne v. Hammond, 37 Ill. 103 ; 3 Parsons on Contracts, 258 ; 2 Chitty on Contracts, 803 ; Brown v. Combs, 63 N. Y. 598 ; Grief v. Cowgill, 2 Disney (Ohio), 54 ; Fain v. Jones, 3 Head (Tenn.), 308; Davis v. Bradley, 28 Vt. 118 ; Sewall v. Nichols, 34 Me. 582 ; Archer v. Mc-Mechan, 21 Mo. (6 Burn) 43 ; 2 Kent's Com. 852 ; Story on Agency, § 376.

The lien of the defendants was not waived or lost, nor were they in any manner estopped from asserting such lien: Conover v. Warren, 1 Gilm. 498; Van Court v. Bushnell, 21 Ill. 624; Brady v. Anderson, 24 Ill. 113; Bayard v. McGraw, 1 Bradwell, 134; Peck v. Standart, 1 Bradwell, 228; 4 Kent's Com. 153; 2 Story's Eq. Jur. 475, note 2.

In order to have a lien on property or goods for advancements of money made thereon, possession of such property or goods is necessary: 3 Parsons on Contracts, 259; Baker v. Fuller, 21 Pick. 318; Bk. of Rochester v. Jones, 4 Comst. (N. Y.) 497; Oliver v. Moore, 12 Heisk. (Tenn.) 10.

Messrs. C. H. & C. B. Wood, for appellee ; that a factor's lien may be controlled by express stipulation, cited Overton on Liens, 143 ; Walker v. Birch, 6 D. & East, 258; Frith v. Forbes, 4 De Gex, Fisher & Jones, 409.

As to waiver of factor's lien : Overton on Liens, 137, 142; Stoddard W. Manufactory v. Huntley, 8 N. H. 441; Fielding v. Mills, 2 Bosworth, 489; Hutchins v. Olcutt, 4 Vt. 543; Rushforth v. Hadfield, 7 East, 224; Jarvis v. Rogers, 10 Mass. 389.

Moran, J.  Appellants claim the right to apply the proceeds

of the stock to the discharge of the indebtedness due them from the Holdermans, on the grounds that as factors to sell they had a general lien on the proceeds of stock sold by them, for any balance due them for advances made, not only on the particular shipment of cattle which they seek to hold, but arising on general account.  It seems to be well settled, that agents, conducting business in the manner in which it is usually conducted at the stock yards, have a lien on the stock coming to their possession, to be sold by them for their principal for general advances.  And this lien is not limited to property acquired with the money advanced, but it seems to extend to all property which comes to the agents' hands.   Winne v. Hammond, 37 Ill. 99 ; Strahorn et al. v. Union Stock Yard Co., 43 Ill. 424.

The lien, however, rests upon the circumstance that there is a continuous service in the regular course of business between the agent and the principal, and being implied from the business and relation of the parties, the parties may so deal or so stipulate that no such lien for general balance will attach.

The right of the factor to hold the goods of his principal for an account due him, may be waived by the factor, and the waiver may be inferred from the manner of dealing between the parties.   Thus, where a special contract is made as to a particular time or mode of payment, a lien will not arise, when, were it not for the special contract, the lien would attach. When the agent takes other security for the debt due him, unless it appears that it was the intention of the parties that the lien should still exist, the lien would be waived.

Here the appellants made a loan to the Holdermans of a sum of money, and did not rely upon their right to retain the money out of the proceeds of stock shipped to them for sale, but took the judgment notes of the Holdermans therefor.  If the money had been advanced in the regular course of business, and they had taken notes for the same in payment, the account would be merged in the higher security, and no action could be brought on the account.   While that alone might not waive their right to assert a lien upon property coming to their hands subsequently, it would at least suspend the right to assert such lien till after the notes became due.  Such would

be the apparent intent arising from the taking of the notes in settlement of the account, and while it appears from the evidence that at the time the $6,000 was advanced it was intended to be used in buying and feeding cattle, yet we think that the fact that the judgment notes were taken, considered in connection with the subsequent conduct of the appellants in dealing with the stock shipped by the Holdermans, raises a fair inference that they did not intend to retain a right of lien for such advance on stock thereafter shipped to them to be sold.    While there are well considered authorities which would justify holding that the taking of the judgment notes for amount advanced is, in itself, such a manifestation of the intention of appellants to rely on the personal security of the Holdermans, as to constitute a waiver of any lien which they might otherwise have on subsequent shipments of stock for such advance, we do not put the case on that ground solely, but treat that as a circumstance to be considered in connection with their subsequent course of dealing, which, when examined, appears to us to show a tacit understanding between the parties that no such lien should be asserted.    It appears that after said money had been advanced, and after some of it had been repaid, the Holdermans, with the knowledge of appellants, made an arrangement with appellee to have him furnish them money to pay for stock purchased and about to be shipped. One of the Holdermans testifies that he told one of the appellants what the arrangement with the appellee was, and that when stock was sold the proceeds should always be placed to appellee's credit, and that said member of appellants' firm agreed that the money should be so placed.    This is denied, but for a period of more than two years appellants appear to have recognized the arrangement, and to have placed to the credit of appellee such portion of the proceeds of the shipment of cattle as the Holdermans directed.    The whole proceeds of shipments were not so placed, it is true.    The Holdermans at times shipped some cattle of their own raising, and the proceeds of these, together with the profits that might accrue from the transactions which were made, went to their own credit; but as we regard these facts, there is enough in them

all taken together to show that it was the intention of the parties that appellants should not have the right to assert a lien upon the stock which the Holdermans shipped, and which was purchased with money furnished by appellee. Jardine v. Roberts, 15 Mass. 389; Hutchins v. Mills, 4 Vt. 549.

On another view we think appellants were prevented from asserting any lien on the proceeds of the shipments of stock. One of the Holderman brothers came with the stock, and told one of appellants that the proceeds of the sale were to be placed to appellee's credit. This was an instruction practically accompanying the delivery of the stock to appellants. Appellants did not refuse to receive and sell the stock under such instructions, but after it was sold sought to hold the proceeds for themselves. In Walker v. Caldwell, 6 Term Reports, 124, the cotton was deposited with the agents, by J. Forbes, for the particular purpose mentioned in the note signed by them, and a special receipt was given by them for it. Lord Kenyon said : " In that note they acknowledge that they had received the cotton for sale, and promised to pay the proceeds of it when sold to J. Forbes or his order. The lien which a factor has on the goods of his principal arises upon an agreement which the law implies; but where there is an express stipulation to the contrary, it puts an end to the general rule of law. Here the parties are bound by their express stipulation, which excludes all idea of a lien." In Brandoo v. Barnett, 12 Clark & Finnelly R. 786, where the question was whether a banker had a lien on certain exchequer bills deposited with him, and which he was directed by his customer, when placed with him, to get the interest due on them and get them exchanged for others, the banker had been in the habit of getting the interest on such bills and getting them exchanged for the customer, and then handing them to the customer to place in tin boxes which he kept at the banker's. Lord Campbell, giving the judgment of the lords, said : " It is hardly denied that if there had been an express understanding by the defendants to exchange the bills and to return the new ones as soon as obtained to Burn (the customer), that he might lock them up, no lien would have been acquired ; but the special verdict shows the

course of dealing between them, and raises an implied promise on their part, which operates as if it was express." In Bock v. Gonison, 2 De Gex, F. & J. 434, where the correspondents of a London firm directed the firm to purchase certain bonds at a certain price, and hold them at the disposal of the correspondents, and the London firm bought the bonds as directed and wrote that until further order they would retain them safely, the court said: "'That from the dealings between these two houses, they came within the category of factors or bankers, with respect to whom it has been proved, and often judicially acknowledged that there is a general lien, unless when there is an express agreement to the contrary, or a particular mode of dealing, inconsistent with a general lien. Whatever the rights of the parties might have been, had there been no special agreement between them respecting the purchase and custody of these bonds, I am of opinion that the evidence proves such a special agreement to have existed, and that this special agreement negatives the claim, set up in behalf of the London house, of a general lien." So it is held in Frith v. Forbes, 4 De Gex, 499, that "The general lien of a consignee can not be set up in opposition to positive directions given to him by the consignor. If a consignee thinks proper to accept a consignment with express directions to apply it, or the proceeds of it, in a particular mode, he can not, as we apprehend, set up his general lien in opposition to those directions."

See also Pickett v. Bullock, 52 N. H. 354 ; Beadler v. Hartmus, 7 Baxter (Tenn.), 476 ; Schiffer v. Fagni, 51 Alabama, 335. In view of these authorities, the directions given to appellants with regard to the proceeds of this particular shipment of stock, and the fact that they proceeded to deal with the stock and indicated their assent to the instructions given, placed appellants in an attitude toward the property, wholly inconsistent with the assertion by them of a lien upon it for a general balance. They received the property with directions to which they assented; they advanced nothing on the particular property, and they in no way changed their position toward the Holdermans upon the credit of it. There is no

ground left to them under the circumstances upon which their right to a lien can rest. In this view it is unnecessary to consider the assignment of error as to the two refused instructions. Assuming them to be correct in point of law, the refusal could not affect the result. Appellee was the proper plaintiff. The proceeds were directed to be placed to his credit, and there was abundant evidence to support the jury in finding that appellants agreed that it should be done. Failing to deposit the money for him as they agreed to do, and wrongfully converting it to another purpose, entitled appellee to maintain an action for money had and received. The money came to their hands from the sale of the stock for appellee's use. The judgment of the superior court must be affirmed.

Judgment affirmed.