DODGE, appellant, *v.* JONES ET AL., respondents.

*Facts held to constitute a delivery valid under the statute of frauds.* — *Section 109, division 5, Revised Statutes of Montana (sec. 226, div. 5, Comp. Stats. Mont.).* — In the case at bar the plaintiff bought twenty head of horses in good faith, and paid twelve hundred dollars for them. These horses were a part of a certain band of horses branded "K" on the left shoulder, and running at large "on the range." When the sale was made the band was driven into a corral of the vendors, the twenty head were selected, branded with a bar under the letter "K," and then turned loose upon "the range" with the other horses of the band. The vendors also executed and delivered a bill of sale to plaintiff. *Held*, there was an immediate delivery and change of possession of the horses sold.

*When a vendor may retake possession of personal property sold, without coming within the prohibition of the statute of frauds.* — The plaintiff left the horses "on the range," in charge of the vendors, who, however, did not attempt to exercise any control over them for five or six months. *Held*, that had the vendors merely had charge of the horses, as the agents of plaintiff, and held them openly in that capacity, it might well be doubted whether that would bring the case within the prohibition of the statute above cited. *Held, also*, that if there had been a continued change of possession of the horses sold for a reasonable time, then the vendors might, without violation of the statute, retake the possession of them as the agents of the plaintiff.

7    121
9    100

7    121
20    228

7    121
33    456
33    458

7    121
c40    100

*Questions of fact for a jury.* — *Held,* in the case at bar, that whether or not there was a regaining of possession by the vendors, and if so, when it took place and the nature of it, and whether it was a reasonable time after the change of possession had taken place, as well as what would be a reasonable time under the circumstances, are all questions of fact for a jury, or a court sitting in place of a jury.

Bach, J., delivered a dissenting opinion.

### *Appeal from District Court, Beaverhead County.*

GALBRAITH & BURLEIGH, for the appellant.

An appeal from an order refusing a new trial brings up the whole record, and error can be assigned in such case upon the findings and judgment roll, and the court has a clear right to reverse the order. See *Hanscom* v. *Tower,* 17 Cal. 518; *Walden* v. *Murdock,* 23 Cal. 540; 83 Am. Dec. 135. We conceive the rule now to be, under our statute, in regard to the actual manual delivery of property sold, that such delivery may be accomplished by the performance of any act or acts which clearly show that the seller has parted with the right and title to the property, and that the purchaser has acquired such right. See Browne on Statute of Frauds, 4th ed., secs. 318 et seq.; *Walden* v. *Murdock,* 83 Am. Dec. 135, note; *Jewett* v. *Lincoln,* 14 Me. 116; 31 Am. Dec. 36, and notes; *Williams* v. *Lerch,* 56 Cal. 330, citing *Walden* v. *Murdock, supra; Rappleye* v. *Adee,* 1 Thomp. & C. 228; *Van Brunt* v. *Pike,* 45 Am. Dec. 126, cases cited, and notes; *Schindler* v. *Houston,* 1 N. Y. 261; 49 Am. Dec. 316, and notes 336, 337, et seq.; *O'Gara* v. *Lowry,* 5 Mont. 427; *Warren* v. *Norten,* 20 How. 448; *Sumner* v. *Hicks,* 2 Black, 532; *Mattingley* v. *Nye,* 8 Wall. 370; *Grubbs* v. *Greer,* 5 Coldw. 160; *Callen* v. *Thompson,* 11 Tenn. 474, 475; Browne on Statute of Frauds, sec. 438. As to venting brands and branding, see Rev. Stats. Mont., pp. 424, 426, 427, 368, sec. 78, p. 395, sec. 192, p. 402; 14 Sess. Laws, 53.

The sheriff took these horses under his execution as a purchaser, and could not be an innocent purchaser

under the circumstances.  There are but two modes of acquiring title to property, to wit, by purchase and descent.  See Bouvier's Law Dict., 15th ed., tit. Purchaser. The general rule is, that where the vendee takes possession at a time subsequent to the sale, but before the rights of creditors accrue or are asserted by attachment, levy, or other lien, such vendee shall hold against the creditors.  See *Clute* v. *Steele*, 6 Nev. 335, and cases there cited; *Bickerstaff* v. *Doub*, 19 Cal. 109, and cases there cited; Bump on Fraudulent Conveyances, 3d ed., 173, and cases there cited in note 5.  As to the case of *Kendall* v. *Sampson*, 12 Vt. 516, cited in *Clute* v. *Steele*, *supra*, see Robert's Vermont Digest, p. 622, sec. 172; and see also *Jewett* v. *Lincoln*, 31 Am. Dec. 39, 40, and notes.

ROBERT B. SMITH, HENRY R. MELTON, and GEORGE W. STAPLETON, for the respondents.

Our statute (which is taken from the statutes of 15 and 27 Eliz.) is not in contravention of the common law, but is simply the enactment of what was understood to be the common law into a statute.  It is an iron rule, but it should, nevertheless, be rigidly enforced, so that the principle which governs in such cases shall be permanently fixed.  See *Hite* v. *Wells*, 17 Ill. 90.  In England it was a long time a mooted question whether the retention of the possession of property by the vendor after an absolute sale was *prima facie* fraud which might be explained, or fraud *per se* which could not be explained away, when the rights of creditors or subsequent purchasers without notice and for a valuable consideration intervened.  Lord Coke and Lord Mansfield contended that a failure to make an immediate and continued change of possession was fraud *per se*.  Such was finally adopted as the English rule of construction in *Twyne's Case*, 3 Coke, 80, and was followed in the case of

*Edwards* v. *Harbin*, 2 Term Rep. 587. In this country the different states have divided on the construction to be given the statute of Elizabeth. But the fraud *per se* rule prevails in most states of the Union, and in the supreme court of the United States. See *Hamilton* v. *Russell*, 1 Cranch, 310; *Hundley* v. *Webb*, 3 J. J. Marsh. 644 et seq.; *Thornton* v. *Davenport*, 1 Scam. 296; *Thompson* v. *Yeck*, 21 Ill. 73; *Reed* v. *Eames*, 19 Ill. 595, 596; *Ketchum* v. *Watson*, 24 Ill. 591; *Dexter* v. *Parkins*, 22 Ill. 146; *Hudnal* v. *Wilder*, 17 Am. Dec. 751, 752; *Peabody* v. *Carrol*, 13 Am. Dec. 305; *Jennings* v. *Carter*, 20 Am. Dec. 635 et seq.; Benjamin on Sales, secs. 483 et seq.; Wait on Fraudulent Conveyances, secs. 250 et seq.; *Stevens* v. *Irwin*, 15 Cal. 506; *Godchaux* v. *Mulford*, 26 Cal. 323; *Woods* v. *Bugbey*, 29 Cal. 469 et seq.

Under our statute itself, a failure to comply with the statute is declared *per se* fraud, without regard to the *bona fides* of the vendor and vendee, as against the creditors of the vendor. From this statute and the decisions above cited, the sale was void, and any creditor could take advantage of the same and subject the property to his debts. See *Hamilton* v. *Russell*, 1 Cranch, 310, decided by Chief Justice Marshall; *Chenery* v. *Palmer*, 6 Cal. 122; *Watson* v. *Rodgers*, 53 Cal. 402, 403; *Edwards* v. *Sonoma Valley Bank*, 59 Cal. 148. From the last cases above cited absolute sales of personal property unaccompanied by an immediate delivery are void, although a delivery may afterwards be had before the levy of the creditor's attachment or execution. It is within the statute of frauds if the property is left in the possession of the vendor, though the vendor be employed or hired by the vendee. See *Fitzgerald* v. *Gorman*, 4 Cal. 290; *Vance* v. *Boynton*, 8 Cal. 554; Bump on Fraudulent Conveyances, 132–134, et seq. The case in 23 California, of *Walden* v. *Murdock*, which was for range cattle, only decides that a vendee has a reasonable time in which to effect a

taking of the property into his possession. A sale of cattle left running at large on the range, unaccompanied by an immediate delivery and continued change of possession, is not protected by reason of the nature of the property, from the operation of the statute. See *Sutton* v. *Ballou,* 46 Iowa, 517.

THE opinion states the case.

McCONNELL, C. J. In this case, the court, sitting instead of a jury, gave judgment for defendants. A motion for a new trial was made and overruled; and from the order overruling the motion for a new trial, and the judgment, the plaintiff below appeals to this court. This is a case of sale and delivery, under section 169, page 436, Revised Statutes of Montana.

The court made fifteen special findings: "1. Defendant Elling, ever since 1880, has been a creditor of James and Robert Kirkpatrick; 2. Defendant Elling, in October, 1885, reduced his claim against said James and Robert Kirkpatrick to a judgment; 3. Said judgment is still unpaid to the amount of $2,985; 4. That in October, 1881, said James and Robert Kirkpatrick sold to plaintiff Lydia C. Dodge twenty head of horses and mares; and that the said horses and mares thus sold, and their offspring, are the same property mentioned in the complaint; 5. That the plaintiff and Robert Kirkpatrick went into the corral of Kirkpatricks, and the twenty head were pointed out to her; 6. That the Kirkpatricks owned a large band of horses branded 'K' on left shoulder, and those sold to plaintiff had this brand on them; 7. That the horses bought by plaintiff were turned out on the range with the rest of Kirkpatricks' horses, and continued to run with them until the sheriff levied on them in July, 1886; 8. That James and Robert Kirkpatrick have at all times, and continuously, had the care, control, and use of said horses, ever since plaintiff

claims to have bought them; 9. That there was no immediate delivery, or continued change of possession, of the horses mentioned in the complaint, from Kirkpatricks to the plaintiff; 10. That plaintiff's brand was put upon the horses in the spring of 1884, after Kirkpatricks had made an assignment; 11. That the horses mentioned in the complaint were by the defendant Jones levied upon and taken into his possession, by virtue of a writ of execution in the case of *Elling* v. *James and Robert Kirkpatrick*; 12. That the plaintiff replevied, and now has the possession of, said horses; 13. The court finds that the plaintiff paid Kirkpatricks twelve hundred dollars for said horses; 14. The court finds that there was and is a constructive fraud in said sale, under the statute."

There is no controversy but that the appellant bought the twenty head of horses from James and Robert Kirkpatrick, in October, 1881, and paid twelve hundred dollars for them, and that this was done in perfect good faith. It is equally admitted that respondent Elling was the creditor of James and Robert Kirkpatrick in 1880; that in 1885 he put his claim into a judgment, and in July, 1886, had an execution issued, and levied upon the twenty horses sold to the appellant in 1881, and the increase thereform, amounting to twenty more; and the only question is, Was the sale made by the Kirkpatricks to the appellant void under the above statute, for the want of an immediate delivery, followed by an actual and continued change of possession, as required by said statute? Said section 169, page 436, Revised Statutes of Montana, is as follows, to wit: "Every sale made by a vendor of goods and chattels in his possession, or under his control, . . . . unless the same be accompanied by the immediate delivery, and followed by an actual and continued change of possession, of the thing sold and assigned, shall be conclusive

evidence of fraud, as against the creditors of the vendors." The court below found that there was no immediate delivery, or actual and continued change of possession, of the horses mentioned in the complaint, from the Kirkpatricks to the appellant. This finding is a conclusion of law from the facts found, or rather, it is an ultimate fact which the law concludes from the facts and circumstances surrounding the sale. A delivery is a question of act and intent,— a mixed question of fact and law. All the facts attending the sale are not in the special findings of the court. When the horses were picked out in the corral, and sold to the appellant, a bar was branded on those sold, under the "K," and then they were turned out on the range with the horses of Kirkpatricks, and there was a bill of sale executed and delivered to appellant.

No particular act or formal ceremony is necessary to make a delivery in law. Any act done, coupled with the intent to change the ownership, which has the effect to transfer the dominion over the thing sold to the buyer, is a delivery. Any small chattel capable of being handled may be delivered by handing it to the buyer, as selling goods across the counter in a store; but horses are not capable of this manual kind of delivery. We think when the bar was branded under the "K," so that the appellant's horses could be distinguished from those of the Kirkpatricks, and they were turned out on the range, those acts were done with the intent to transfer the ownership and dominion over these horses to the appellant. When they were on the range, the actual possession was in no one. The range was common pasturage for everybody, and the constructive possession accompanies the title, and was in the appellant. What more could have been done to constitute a delivery? The law does not require a proclamation of delivery to be made, nor that these horses should be temporarily sep-

arated from the others, or put in a corral or inclosure. All that was necessary to be done was done. There was a permanent identification of her horses, and the relations of the parties to these horses were changed. But when this was done, they were turned out of Kirkpatricks' corral, and went off on the range, thus severing all connection between them and their former owners. By this there was an unmistakable delivery and actual change of possession. We do not review the findings of fact by the court in coming to this conclusion; the facts are not disputed. But we hold that whether the facts found constitute a delivery is a question of law, and that the court erred in its conclusion of law, when it found there was no immediate delivery. The question as to whether there was such a venting as the statute contemplates does not enter into this discussion. The horses were not *vented* in any sense of that word. The effect of putting the bar under the "K" was to distinguish them from the horses of the vendors, and to be looked to, in connection with other facts, to determine whether there was a delivery.

But as we are construing the statute of frauds, above referred to, perhaps it would be well to further notice the term "delivery," as used in the authorities. It is sometimes used to denote the transfer of *title*. Upon the subject of constructive possession, Wait, in his Actions and Defenses (volume 5, p. 574), says: "A sale of personal property must, in general, be accompanied by a change of possession of the thing sold. The law, however, does not require the parties to a sale to perform acts extremely inconvenient, if not impossible, but accomodates itself to their business, and the nature of their property; and therefore, as some kinds of property are not susceptible of immediate manual delivery, the law requires only such delivery and change of possession as the nature of the property will allow [citing *Long* v.

*Knapp*, 54 Pa. St. 514; *Bailey* v. *Ogden*, 3 Johns. 399];
and, in general, the assertion of complete authority on
the part of the vendee, by acts consistent only with
ownership, and assented to by the vendor, constitutes
a sufficient constructive delivery," citing authorities.
The circumstances which are to be held tantamount to
actual delivery ought, however, to be so strong and un-
equivocal as to leave no reasonable doubt as to the in-
tent of the parties. *Clark* v. *Draper*, 19 N. H. 419; *Cart-
wright* v. *Phœnix*, 7 Cal. 281. "Selecting and marking
sheep in the possession of a third party, who is de-
sired to retain possession of them for the purchaser, is a
sufficient delivery to complete the sale and pass the
property." *Barney* v. *Brown*, 2 Vt. 374. And when the
seller pointed out certain cattle of his, which were run-
ning with others in a pasture, and designated their price,
which the purchaser agreed to take as they were, and at
the stipulated price, it was held that this constituted a
delivery of the cattle. *Brown* v. *Wade*, 42 Iowa, 647;
*Sutton* v. *Ballou*, 46 Iowa, 517.

But it is needless to multiply authorities on this sub-
ject. The facts found and admitted are: 1. Sale of the
horses to appellant by James and Robert Kirkpatrick;
2. Price paid, and bill of sale executed and delivered; 3.
Bar branded under letter "K" on horses sold; 4. Turned
out of corral of vendors upon the "range"; 5. They
were range horses; 6. All this done within one hour.
We hold that this constitutes an immediate delivery and
actual change of possession.

The court below found that James and Robert Kirk-
patrick have at all times, and continuously, had the care,
control, and use of said horses, ever since plaintiff claims
to have bought them. The appellant, in her assigment
of errors, says that this finding is not justified by the
evidence, and is against the law. The statute provides
that this change must be "actual and continued."

When the title to the chattel is in a person, and it is not so situated as to be under his immediate dominion, and is in the actual possession of no one else, it is said to be in his constructive possession. The horses, when in the corral of the Kirkpatricks, under their immediate dominion, were in their actual possession; but when they left this inclosure, and were on the "range," they were in the actual possession of no one, but in the constructive possession of the owner. Now, if we are right in our conclusion that there was a delivery and a change of possession, and that the horses, when on the "range," were in the constructive possession of the owner, does the record show that the vendors of the appellant regained possession, so as to bring this transaction within the statute of frauds?

But before doing this, it is necessary to construe the meaning of the words "continued change." Does it mean that the chattel sold shall never again come into the possession of the vendor without being subject to seizure for his debts? Certainly not. If this was the correct meaning of it, the law would soon stop the whole machinery of trade, and no one would dare to let his vendor have the possession, ever so short a time, of any chattel he may have obtained from him. The purpose of the statute was to prevent fraudulent and colorable sales, made to hinder and delay creditors, in which the vendor never parts with the thing sold, or if he does, it is only for a short time, when it is returned to him, and he continues to use and enjoy it. Hence the statute provides that there shall be an "immediate" delivery, and there shall be an "actual" change of possession, and this change shall be a "continued" one. But continued how long? We think for a reasonable length of time, — such a length of time as will preclude the idea that the sale is a colorable one. To give this statute any other construction would be to convert its

beneficent provisions into an engine of injustice and oppression.

In the case of *Stevens* v. *Irwin,* 15 Cal. 503, the supreme court of the state of California, in construing their statue of frauds, which is identical with ours (Mr. Justice Baldwin delivering the opinion of the court), said: "In this controversy as to what the true common-law rule is, the legislature wisely adopted, by statute, the construction given by the supreme court of the United States; for this course had at least the advantage of giving to the state one uniform rule in all courts on this important subject. But we apprehend that the legislature never intended, by this statute, to go beyond the extreme rule adopted by the supreme court of the United States, and the English cases on which that rule rests. There was no reason of policy for such extension; indeed, such extension might defeat, in some degree, the reason for adopting the federal rule. The rule, as defined by our statute, is almost in the language of that given in the cases which establish the rule in England. It is true that some stress is laid on the words 'actual and continued change of possession'; but these words are suggested by the facts and principles of the decided cases referred to. The word 'actual' was designed to exclude the idea of a mere formal change of possession, and the word 'continued,' to exclude the idea of a mere temporary change. But it never was the design of the statute to give such extension of meaning to this phrase, 'continued change of possession,' as to require, upon a penalty of a forfeiture of the goods, that the vendor should never have any control over or use of them. This construction, if made without exception, would lead to very unjust and very absurd results. The vendor would never become trustee of the goods without their being forfeited or liable for his debts. If a livery-stable keeper hired a horse to the original vendor, it would be

liable for his debts; or if a boarder came into a room, the furniture might be liable for his debts if he once owned it. The 'continued change of possession,' then, does not mean a continuance for all time of this possession, or a perpetual exclusion of all use or control of the property by the original vendor. A reasonable construction must be given to this language, in analogy to the doctrine of the courts holding the general principles transcribed in the statute. The delivery must be made of the property. The vendee must take the actual possession. That possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. It must be such as to give evidence to the world of the claims of the new owner. He must, in other words, be in the usual relation to the property which owners of goods occupy to their property. This possession must be continuous; not taken to be surrendered back again; not formal, but substantial. But it need not necessarily continue indefinitely, when it is *bona fide* and openly taken, and is kept for such a length of time as to give general advertisement of the *status* of the property, and the claim to it by the vendee."

This case is referred to and approved by Sanderson, C. J., in the case of *Godchaux* v. *Mulford*, 26 Cal. 325.

If Robert Kirkpatrick merely had the charge of the horses after they were sold, as an agent, and held them openly in that capacity, it may well be doubted whether that would bring the case within the prohibition of the statute, which says the change of possession must be continued. In the case in 26 California, already cited, the court, discussing the effect of putting the vendor in possession of a stock of goods, to sell them as a clerk, says: "Such employment is undoubtedly a strong circumstance tending to show that there has not been such an actual change as the statute requires; but it is not *per se* a fraud which admits of no explanation. As is

well said by counsel for the plaintiffs: 'A hired clerk or salesman is no more in the possession of the goods of his employer than a hired laborer is in possession of the farm on which he is employed at work.' The employment of the vendor in a subordinate capacity is colorable only, and not conclusive on the question as to whether there has been an immediate delivery and an actual change of possession. He cannot be allowed to remain in the apparently sole and exclusive possession of the goods after the sale, for that would be inconsistent with such an open and notorious delivery and actual change as the statute exacts, in order to exclude from the transaction the idea of fraud. But if it be apparent to all the world that he has ceased to be the owner, and another has acquired and openly occupied that position; that he has ceased to be the principal in the charge and management of the concern, and become only a subordinate or clerk,—the reason of the rule announced in the statute is satisfied. The immediate delivery, and actual and continued change of possession, are the ultimate facts by which, according as they are present or absent, the statute determines the legal character of the sale; but the instruction in question makes the bare employment of the vendor by the vendee, in a subordinate capacity, regardless of the fact whether such subordinate capacity is open and notorious or not, the ultimate fact by which the statute determines the question of fraud; whereas, it is only a probative fact to be taken into account in determining the ultimate facts mentioned in the statute, and by which the question of fraud is determined." *Warner* v. *Carlton*, 22 Ill. 424.

Now, let us see what evidence there is to support the finding of the court below, that the possession remained with the vendors of the appellant. She says she left the horses in charge of the Kirkpatricks, and went to Santa Barbara, California, to spend the winter. The horses

were cared for by the Kirkpatricks up to some time in 1884. "In that year I received a letter from the Kirk-patricks informing me that they were intending making an assignment for the benefit of their creditors, and that there might be danger to my horses, as they were not then branded. I then had them branded with the 'apple' brand which my sister had caused to be made for me. My reason for not branding the horses at the time of the purchase of them by me from the Kirkpat-ricks was that I thought it very cruel to do so. In April, 1882, when I came back, I saw the horses nearly every day. In September, 1882, I went to Lynn, Massa-chusetts, and remained there nearly two years. During that time Robert Kirkpatrick had charge of the horses for me. At the time I bought the horses they were branded with the letter 'K' on the left shoulder, and they were vented with a straight bar under the 'K.'"

Robert Kirkpatrick testified: "The horses were sold to Miss Dodge in 1881. At the time of the purchase by her they were in a corral. They were branded 'K' on the left shoulder; vented them by putting a bar under the 'K.' In the spring of 1882, I got up some of the horses with our brand on them. During the years 1882, 1883, and part of 1884, I had charge of the horses. We put the 'apple' brand on the horses in 1884. Monroe Mann gave us contract to breed the mares to the stallions. Know the gray mare; used her. Do not remember of using or working more than one of the horses. Allen Black broke a five-year-old horse, at my request, in the spring of 1886. They were range horses,—stock horses. In 1884 Monroe Mann was the agent of Miss Dodge, and I had charge of the horses under Mann's direction."

Mr. Jones testified that the horses were in charge of the Kirkpatricks from the date of the sale, or assign-ment, which they made of their own stock, which was in 1883.

It will be seen from the testimony that the horses were range or stock horses. The appellant bought them in October, 1881, and spent the winter following in California, and left them, not in the possession of the Kirkpatricks, but on the range, in the possession of no one, but in the charge of her vendors. Robert Kirkpatrick says he got some of them up in the spring of 1882, and that is the first act of control he exercised over them, so far as the record discloses. The sale was made in October, 1881; there was delivery and change of possession, and no act of control by the vendors for five or six months afterwards.

1. We find then, that, as a matter of law, from the facts found by the court, with the additional facts which are admitted, there was an immediate delivery at the time of the sale, and that the court, in concluding there was not, from the facts found and admitted in argument before us, was in error.

2. The court erred in finding that there was not a change of possession, when he found the fact that the horses were turned out of the corral of the Kirkpatricks on the "range."

3. The court below, in its findings, having erroneously concluded that there was no delivery, and no change of possession, necessarily could not have considered whether an interval occurred between the severance of the possession of the Kirkpatricks and the time when they regained the possession, if they did regain it at all. If there was a continued change of possession for a reasonable length of time, then they might retake the possession, as the agents of the appellant, without being obnoxious to the statute of frauds. The question as to whether there was a regaining of the possession, and if so, when it took place, and the nature of it, and whether it was a reasonable time after the actual change of possession had taken place, as well as what would be a

reasonable time, under the circumstances, are all ques-
tions of fact for the jury upon a new trial, or for the
court, if it sits again in lieu of a jury.

Let the case be reversed, and remanded for a new
trial, under the principles set forth in this opinion

GALBRAITH, J., concurs.

BACH, J. (*dissenting*). I am compelled to differ from
the majority of the court in this case. The case is one
of peculiar hardship, for there is no question of fraudu-
lent intent, or fraud in fact; still, in my view of the
evidence, it is a case which is governed by the statute
concerning fraudulent conveyances, as passed by the
legislature of this territory, which, wisely determining
to avoid the conflicting authorities upon this question,
declared that the presumption of fraud was conclusive,
as to creditors and purchasers in good faith, when a
sale of personal property was not followed by an im-
mediate delivery, and an actual and continued change
of possession.

While I do not dispute the rules of law stated in the
prevailing opinion, I doubt that they control this case.
There cannot always be a manual delivery, or personal
and definite possession, of property. The very nature of
certain classes of property prevents that; and there can
be no force in the rule of law that would seek to forbid
the vendor from ever having the possession of the
property, even as the agent of the vendee, or as his
bailee for hire. But the delivery of the property, how-
ever indefinite it may be, must be a delivery to the
vendee, and must be a breaking of the possession of the
vendee, and must be a breaking up of the possession of
the vendor; and the possession (to quote the opinion
cited by the learned chief justice in *Godchaux* v. *Mulford*)
"must be continuous; *not taken to be surrendered* back
again; not formal, but substantial." In this case there

was but a formal delivery, if indeed there was delivery at all, to the vendee. If there ever was possession in the vendee at all, it was "taken to be surrendered back again" immediately to the vendor. The possession of the property, however definite or indefinite, was in the vendor, and according to the testimony of the plaintiff herself, it remained in the vendor. It is true, the brand on the horses was changed, but it was not vented, and the brand of the plaintiff was not placed on them for years after the sale.

It is my opinion that the testimony of the plaintiff shows that there was no actual, "substantial" change of possession or immediate delivery of the property. That testimony is brief, and is as follows, in full: —

"Am plaintiff in this action. Know the property described in the complaint. Bought it in the fall of 1881. Took a bill of sale of it, and had it in my possession. The signature of it is in the handwriting of Robert Kirkpatrick. I paid twelve hundred dollars for the property. Bought the horses of the Kirkpatricks. At the time I bought them they were driven into a corral with a lot of other horses. The horses I bought were shown to me; the price for each one named. I took those which suited me, and they were then driven or turned out on the range near by within an hour afterwards. Left the horses in charge of the Kirkpatricks, and went to Santa Barbara, California, to spend the winter. The horses were cared for by the Kirkpatricks up to some time in 1884. In that year I received a letter from the Kirkpatricks, informing me that they were intending to make an assignment for the benefit of their creditors, and that there might be danger to my horses, as they were not then branded. I then had them branded with the 'apple' brand which my sister had caused to be made for me. After that I made Mr. Monroe Mann my agent to look after my horses, but he was not prepared to take

care of them, and Mr. Robert Kirkpatrick has had almost the entire control of said horses until they were levied on by the sheriff, and has used them and worked some of them; and Mr. Kirkpatrick has had the most of the care and control of said horses all the time. My reason for not branding the horses at the time of the purchase of them by me from the Kirkpatricks was that I thought it very cruel to do so. In April, 1882, when I came back, I saw the horses nearly every day. In September, 1882, I went to Lynn, Massachusetts, and remained there nearly two years. During that time Robert Kirkpatrick had charge of the horses for me. At the time I bought the horses they were branded with a ' K ' on the left shoulder, and they were vented with a straight bar under the ' K.' "

If there was a substantial change of possession, as evidenced by the statement of the plaintiff, it would be difficult to imagine any case which would come within the statute relating to fraudulent conveyances. The learned chief justice cites with approval the following: " The delivery must be made of the property; the vendee must take actual possession; that possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee." In this case, was the possession " unequivocal, carrying with it the usual marks and indications of ownership by the vendee" ?

There never was any delivery of any kind. The vendee never had the horses in her actual possession for one moment, and the constructive possession by the vendee, if any there was, cannot be called a "substantial " or " unequivocal " possession; it was "taken merely to be surrendered back again." The horses were in the possession of the vendor before they were driven to the corral; they were in his possession in the corral; they were driven out of the corral; and, in the words of the

plaintiff, they were turned out on the range, and the vendors "had the care and control of them all the time."

So much for the possession. What change was there which would "give evidence to the world of the claim of the new owner"? They were in the care and control of the vendor; they were on the same range that they had occupied before the sale (which in this country is no slight evidence); they were never out of the possession of their former owner. The only circumstance evidencing a change was the addition of the bar to the "K" brand. This was not the "usual mark of ownership of the vendee"; and it did not "give evidence to the world of the claims of the new owner." The brand "K" with a straight bar was the brand of no one. It was certainly not the brand of the plaintiff. Her brand was the "apple" brand. It was not even venting of the vendors' brand, which might have been *prima facie* evidence of a change of ownership, and thus, perhaps, notice to the world "of the claims of the new owner." Section 113, page 426, Revised Statutes of Montana, provides that the venting of " such original brand shall be *prima facie* evidence of sale or transfer"; and that section provides what shall be considered a "vent brand"; and the straight bar is not one of the modes of venting an original brand. It is true, the plaintiff testifies that she did not have the horses branded, because she thought it very cruel to do so; but it is doubtful that such a tender sentiment would excuse the performance of an act which, in this country, would be some evidence of the "claims of the new owner," especially when that sentiment did not prevent her from assenting to the branding with the straight bar at the time of the sale, or to the branding with the "apple" brand when she was warned of the assignment by the vendors for the benefit of their creditors.

To briefly state the points I would make: I am of

the opinion that the expression "immediate delivery, and actual and continuous change of possession," must be interpreted reasonably and fairly; that where an actual delivery cannot be had,—where personal possession cannot be had,—the delivery and the possession may be constructive; but that constructive possession must be as complete as possible under the circumstances. I am also of the opinion that the character of the delivery and possession must depend upon the kind of chattel sold, and that it therefore may be indefinite; but however definite or indefinite the delivery and possession may be, it must be a delivery to the vendee, it must be the possession of the vendee. And I cannot agree with the learned chief justice, either as to the statement of the fact or as to the statement of law, in that portion of his opinion which reads as follows: "The appellant bought them in October, 1881, and spent the winter following in California, and left them, *not in the possession* of the Kirkpatricks, but on the *range*, in *the possession of no one*, but in the charge of her vendors." As a question of law, it is impossible to conceive of personal property being "in the possession of no one," unless it is lost; as a question of fact, the plaintiff says, "Mr. Kirkpatrick has had most of the care and control of said horses all the time"; and again, "I left the horses in charge of the Kirkpatricks, and went to Santa Barbara." Prior to and at the time of the sale, the horses were in the constructive possession of the vendors; while in the corral, they were in the actual possession of the vendors; immediately thereafter they were left in the "charge," in the "care and control," of the vendors; and they were, therefore, again in the at least constructive possession of the vendors; for not one moment were they in the possession of the vendee, and upon no occasion did she perform any act which would give evidence, to the nearest possible and most careful observer, that she was "the new owner" of the horses.

The cases of *Stevens* v. *Irwin*, 15 Cal. 503, and *Godchaux* v. *Mulford*, 26 Cal. 325, so much relied upon in the prevailing opinion, seem to be authority for this dissenting opinion; and that seems to be the conclusion of the supreme court of California in *Woods* v. *Bugbey*, 29 Cal. 467. In the first opinion delivered in the last cited case the court say (page 473), commenting on the former cases: "In no case that we are aware of has the supreme court of this state laid down a rule requiring less than that the purchaser must have that possession which places him in the relation to the property which owners usually are to the like kind of property." And again, in the opinion delivered on the rehearing, the court say, commenting on the same cases (page 475): "The plaintiff's counsel is quite mistaken in supposing that we overruled *Godchaux* v. *Mulford*, *ex necessitate*, by anything said in our opinion in this case. In that case it is distinctly held that the vendor cannot be allowed to remain in the apparently sole and exclusive possession of the goods after the sale; for that, it is said, would be inconsistent with such an open and notorious delivery and actual change as the statute exacts, in order to exclude from the transaction the idea of fraud." See also *Hamilton* v. *Russell*, 1 Cranch, 310; *Tilson* v. *Terwilliger*, 56 N. Y. 274; *Sutton* v. *Ballou*, 46 Iowa, 518; *Dexter* v. *Parkins*, 22 Ill. 144, in which case the court say (page 146): "In this case, the evidence does not show any delivery of the property to the claimant after the execution of the bill of sale. It is absolute on its face, yet the property remained *as much in the possession* of Smallridge as it did in that of the claimant, after as before its execution. Such circumstances are not evidence of fraud, but are fraud absolutely."

The learned chief justice cites as authority the case of *Warner* v. *Carlton*, 22 Ill. 415. In that case the court say (page 424): "If the vendor, after the sale without

a delivery of the goods, were to remain in the sole and exclusive possession, *it would amount to a fraud in law;* but such is not the evidence in this case. No evidence showed that R. H. Carlton, the vendor, was in the sole and exclusive possession, but it tended to show that he was only acting as a clerk, and that Tilfer was the person having charge of the concern, and was the principal in its management." Tilfer was the representative of the vendee. Inasmuch as, in the case which we are considering, the vendor did remain "in the sole and exclusive possession," and that he did have charge of the property, it may well be doubted that the last cited case is an authority sustaining the validity of the sale in this case; more especially when we consider the language of the same court, in the same volume of reports, as cited in *Dexter* v. *Parkins, supra.*

The case of *Sutton* v. *Ballou,* 46 Iowa, 518, is also cited in the prevailing opinion as authority therefor. The following statement of facts is taken from the opinion of Day, C. J.: "The evidence tends to show that, before the contract of purchase was made, the cattle had been separated from O'Harra's, the vendor's, other cattle on the range, by his son, and driven about a mile. After the plaintiff bought them, they were driven twenty or thirty rods on the range, and then plaintiff hired O'Harra's boy, through his father, to herd them. After that these cattle remained with others owned by O'Harra, and were herded on the prairie, sometimes by this boy and sometimes by O'Harra's other children. The cattle went into a bunch together, were driven up at night by the boy, and O'Harra frequently went out in the morning to look after them. No change was observable in the manner of keeping the cattle until O'Harra left, about the last of July." The learned chief justice of this court is mistaken when he says that the Iowa court held the sale valid as against creditors. The jury had held the

sale fraudulent for want of delivery, and in delivering the opinion, Mr. Chief Justice Day says (page 519): " In this case the jury might well find from the testimony that the property was left with the seller, and his relations to it continued unchanged, so far as the world could know from the acts of the parties. The verdict, we think, therefore, is not without support in the testimony." And again, on page 521, the learned judge says: " However sufficient these facts might be as between the parties to pass the title, they are not sufficient under section 1923 of the code, so long as the vendor was allowed to retain the actual possession." The sale was held to be void as against a subsequent mortgagee without notice. I have already cited this as an authority for my view of this case; and it seems to me to be conclusive, although not so strong. The relation of the Kirkpatricks to the horses remained unchanged for years. There was no son who had the control, but that control was in the vendors directly.

The case of *Brown* v. *Wade*, 42 Iowa, 647, is also cited. There was no question of a fraudulent sale in that case; there was no creditor interested in the action. The point in that case was whether or not there had been such a delivery as to take the contract of sale out of that section of the statute of frauds which refers to parol executory contracts. Mr. Chief Justice Day wrote the opinion in that case also; and in the subsequent case of *Sutton* v. *Ballou,* he briefly draws the distinction between delivery as between the parties under the statute of frauds, and delivery under the statute concerning fraudulent conveyances, and says (page 518): " Appellant cites and relies upon *Brown* v. *Wade*, 42 Iowa, 647. That case involved simply *a question of delivery as between the parties to the contract.*"

And the citation from 5 Wait on Actions and Defenses, as follows: " And in general, the assertion of

complete authority on the part of the vendee by acts consistent only with ownership, and assented to by the vendor, constitutes a sufficient constructive delivery,"— refers to the question of delivery as between the vendor and the vendee, as to compliance with the statute of frauds relating to parol contracts. The learned author, Mr. Wait, cites as his authority section 311, Story on Sales, and the language used is a quotation from section 311. That section (311) is a portion of chapter 10, Story on Sales, which treats of the question of delivery as *between* the parties; and the learned author, at the very outset of chapter 10 (see section 295), cautions his readers to draw the distinctions. In section 295 he says: "There are four different species of delivery: 1. That delivery which suffices to pass the title, so that if the goods be destroyed the loss falls upon the vendee, *which will form the subject of the present chapter;* 2. That delivery which *suffices* to destroy the lien of the vendor," etc. It is evident that the learned author, Mr. Story, was not treating of the question of *delivery* under the statute relating to conveyances fraudulent as to creditors and subsequent purchasers in good faith.

And so in the case of *Bailey* v. *Ogden*, 3 Johns. *399, cited in the prevailing opinion of this court, and by Mr. Wait in support of his quotation from Mr. Story. That was a case between the vendor and vendee, involving the statute of frauds relating to parol executory contracts. Mr. Chief Justice Kent delivered the opinion of the court, and at the very commencement of his opinion says: "This case depends upon the decision of two general questions: 1. Was there a note or memorandum in writing, binding upon the defendants, within the meaning of the statute of frauds? If not, then, 2. Was there a delivery of the sugars so as to change the property, and throw the risk of the subsequent loss upon the defendants?"

A delivery may be sufficient to satisfy the statute of frauds relative to executory parol contracts, and yet fall far short of satisfying the statute against fraudulent conveyances. See Story on Sales, sec. 279, note 1. See also citation from *Sutton* v. *Ballou, supra.*

It remains only to consider the facts in the two cases chiefly relied upon by the learned chief justice, — *Stevens* v. *Irwin,* 15 Cal. 503, and *Godchaux* v. *Mulford,* 26 Cal. 317. The facts differ essentially from the facts of this case. In *Stevens* v. *Irwin,* it appears (see page 507) that the vendee had the exclusive possession of the property for a year or more. In *Godchaux* v. *Mulford* (page 321), the facts are stated to be as follows: " The sale closed on December 16, 1857, by the execution of a bill of sale and a lease of the store-room, from which the vendor's sign was removed, and the vendee's sign was placed thereon. A person by the name of Blum, who seems to have had no connection with Kraft (vendor) in any way, was employed by the plaintiffs (vendees) to take immediate possession for them. He did so take possession, and retained it until one Black was sent up by them from San Francisco, who remained there until the goods were seized by the sheriff, in February, 1858. After the sale, Kraft was absent some three weeks in San Francisco, but at the time of the levy by the sheriff, he, *together with one of the plaintiffs and Black, was in the store,* and was arranging goods in a show-case. In the first case, it will be seen that the vendor did not resume possession until a year or more after the sale, during which time the vendee was in the exclusive possession. In the second case, the vendor parted with the possession absolutely for some considerable time, parted with the building by leasing it, his sign was removed from the store and the vendee's sign was placed thereon, and the vendor never was again in the sole and exclusive possession of the property." These facts do not resemble those

in the case at bar.    But the opinion in the case of *Stevens*
v. *Irwin*, 507 (cited in *Godchaux* v. *Mulford*), does apply
with peculiar force to this case.    "The delivery must be
made of the property; the vendee must take the actual
possession. . . . . This possession must be continuous;
not taken to be surrendered back again; not formal, but
substantial."

In my opinion, therefore, the court below had some
testimony upon which to base the finding that there was
no immediate delivery, or actual and continued change
of possession; and the judgment and order of the court
below should be affirmed.