BROWN, APPELLANT, *v.* FEDERAL SURETY CO., RESPONDENT.

(No. 6,866.)

(Submitted January 11, 1932. Decided February 8, 1932.)

[8 Pac. (2d) 647.]

*Mr. C. E. Pew* and *Mr. Sherman W. Smith,* for Appellant,
submitted a brief; *Mr. Pew* argued the cause orally.

*Messrs. Gunn, Rasch, Hall & Gunn,* for Respondent, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal from a judgment entered upon a verdict directed in favor of defendant.

It appears that Lalonde, Peck and Powers, in September, 1924, entered into a contract with the state highway commission to construct what is known as the Babb-Cardston road in Glacier county, Federal Aid Project No. 208–A. In October, 1924, the contractor entered into a subcontract with C. H. Windsor, whereby the latter agreed to furnish all materials, tools, machinery and equipment and to do and perform all of the work and labor provided for in the contract between the contractors and the state. On October 27, 1924, as security for the performance of the subcontract, Windsor and the Federal Surety Company, hereafter called the defendant, gave a bond to the contractors. In making application for the bond, Windsor, called the principal therein, gave to the defendant, called the company, a statement of his financial condition, in which he valued the equipment at $38,000. The application contained this provision:

"That for the better protection of the said Company, and as of the date hereof, the said Principal does hereby assign, transfer and convey to the said Company, all right, title and interest in and to all the tools, plant equipment and materials of every nature and description that said Principal may now or hereafter have upon said work, or in or about the site thereof, including as well materials purchased for or chargeable to said contract, which might be in process of construction, or storage elsewhere, or in transportation to said site, hereby assigning and conveying also all rights in and to all subcontracts, which have been, or may hereafter be entered into and the materials embraced therein, and authorizing and empowering said Company, its authorized agents or attorneys, to enter upon and take possession of such tools, plant equip-

ment, materials and subcontracts, and enforce, use and enjoy such possession upon the following conditions, viz.: This assignment shall be in full force and effect as of the date hereof, should the said Principal fail, or be unable to complete the said work in accordance with the terms of the contract covered by said bond, or in the event of any default on the part of the said Principal under the terms of said contract.''

The bond provided that in case of default by Windsor ''the surety shall have the right, at its option, after receipt of such statement, to proceed with, or procure others to proceed with, the performance of such contract and shall thereupon immediately be subrogated to all the rights of the Principal and of the obligee.''

The subcontractor provided that in case of default by Windsor the obligee ''shall have the right to enter upon the premises and take possession thereof and complete the work included under this contract, including the furnishing of materials, and for that purpose shall have the right to make use of any materials, tools, equipment and appliances of the party of the second part then upon the ground, and may employ any other person or persons to complete the said work and to provide the materials therefor.''

At this time Windsor was working upon the incomplete ''Birch Creek'' project as a subcontractor. When Windsor stopped work in the fall of 1924 he left his equipment at Browning or near by in charge of his foreman, Milliken. Of this more later. Windsor returned in the spring of 1925 and continued work on the Birch Creek project, until the last of April, when he proceeded to the Babb-Cardston project, taking the equipment with him and using the same until November, 1925, when he was unable to proceed for lack of money. Plaintiff claims Windsor used the equipment during 1925 upon a rental basis. Defendant took possession of the equipment in November, 1925, and used the same during the year 1926 in completing the Babb-Cardston project. The defendant, upon the completion of the Babb-Cardston project hauled the equipment to Browning and stored it there, laying no further claim thereto. The record does not indicate that

plaintiff has sought in any way to reclaim the property thus stored.

In 1929 the plaintiff began this action against the defendant for the sum of $10,165, as rental for the use of the equipment. He alleged that at the special instance and request of the defendant he had furnished to the defendant certain equipment which was used by "the said D. A. Crichton and Company for the crushing of large quantities of gravel used in such construction work and distribution upon the construction work, gravel, steel and construction materials of various kinds, and other materials in connection with the work, in that he furnished for use in the construction a caterpillar, tractors, trucks, and the like; also camp buildings mounted on wagon trucks, including cooking and sleeping outfit for fifty men, all of which equipment was used in the construction work by the defendant, and that the reasonable value of the machinery, trucks, tractors and other equipment and personal property so made by the defendant was at the time the same was so used, and still is, of the value of $10,165; that the plaintiff is still the owner and holder of the claims arising from the furnishing and use of the equipment and other personal property hereinabove described by said Federal Surety Company, and that the said sums so due as aforesaid are still due to plaintiff, and that no part thereof has been paid."

Except as to admitting formal matters alleged in the complaint, that the defendant gave the bond, and that the defendant took over and completed the construction work under the contract and bond, the answer is a general denial of the allegations of the complaint.

To make out his case plaintiff testified that he became the owner of the property described in the complaint, hereafter referred to as the equipment, in virtue of a bill of sale dated January 27, 1925, wherein Windsor appears as vendor and plaintiff and one Korthoff as vendees. This document purported to convey the equipment for a consideration of $15,000. Plaintiff contends that this sum was a credit allowed Windsor upon an indebtedness of $22,000 owed him by Windsor. When the purported bill of sale came into plaintiff's possession is

not clear. It appears that he sent it to Mr. McDonald of Browning in March, 1925, with instructions to file it with the county clerk. Plaintiff said he bought Korthoff's interest in the equipment within two or three weeks.

Plaintiff had been the financial backer of Windsor in South Dakota and upon the Birch Creek project. He had kept books for Windsor on the Birch Creek project in 1924, and had assisted him otherwise considerably, taking care to apprise the people generally that he was Windsor's employee, not his partner. Plaintiff says Windsor was indebted to him for $22,000 in December, 1924, and the two had discussed a sale of the property by Windsor to plaintiff.

In late January, 1925, plaintiff went from Minneapolis to Browning where he found the equipment in charge of Milliken. At that time some of the machinery was stored in Browning while other was along the highway. Plaintiff, so he testified, brought in all that he could through the snow, stored it in a kind of a garage in Browning, and set mechanics to work repairing it. He could not bring in a crusher but left orders that it be brought to town and repaired. In the overhauling of the machinery "there were three or four mechanics there, maybe more than that, but Milliken was my general overseer; he was in charge of it for me." Plaintiff paid the taxes on the equipment in 1925 and 1926 but "was not billed for 1927." Plaintiff says he remained in Browning until the last of February, when he went to Hettinger, North Dakota, leaving Milliken in charge of the equipment for him; Milliken retained possession thereof until Windsor came back to Browning and resumed work on the Birch Creek project in the spring of 1925. Plaintiff said he knew Windsor was "going to use the same equipment on the Babb job that he had used on the Melchert job." About the last of April Windsor, Milliken with him, took the equipment to the Babb-Cardston project upon which he used it until about the first of November, 1925. Plaintiff said after the bill of sale was delivered to him, Windsor used the equipment, paying rental therefor. There was no documentary evidence introduced respecting the payment of rentals by Windsor to plaintiff.

Plaintiff said: "In the fall of 1925 the Federal Surety Company took over Windsor's entire layout, took over the contract and took possession of this equipment and started in to carry out Mr. Windsor's contract for the construction of the road." His knowledge of the use of the equipment in 1926 he obtained from people who wrote him about it. He testified: "I am still the *owner of the claims* for this rental arising out of the use of that machinery and equipment." (Italics ours.)

Plaintiff introduced in evidence a series of letters written between himself and D. A. Crichton & Co., agent of the defendant, with relation to the use of the equipment. Crichton had received information that the crusher stood in the name of plaintiff. The letters disclose that plaintiff claimed to own all of the equipment but was willing that the defendant might use it, paying a designated rental therefor. Defendant emphatically refused to pay rental and later denied plaintiff's ownership in the equipment.

It appears from the testimony of Windsor that on November 3, 1925, there was a meeting in Browning to discuss his financial affairs; and plaintiff was there, also Mr. Crichton, representing the defendant, Messrs. Lalonde, Peck and Powers, Mr. Sherburne, the banker, and Mr. McDonald, the attorney. After the conference, it would seem, according to the testimony of Windsor, Crichton, in McDonald's office, said he would take over the work if Windsor would let him use the equipment, render him accounts of the pay-roll, and give him such information "as is required from time to time." He testified that Crichton said: "Well, this equipment isn't yours, it belongs to Brown," to which Windsor replied, "Yes, it is, and if you will carry out the program and pay the rentals as I have obligated myself, I am sure Brown will be agreed."

Windsor testified that Mr. Sherburne, the banker, said if Mr. Crichton would O. K. the payment he would lend Windsor $600, whereupon Windsor signed a note and obtained money on it. It does not appear that Crichton did so; on the contrary, on that same day Windsor executed to the bank, of which Mr. Sherburne was president, two notes aggregating $600, and, to secure payment thereof, executed a mortgage to

the bank upon ''all machinery, equipment, trucks and tools of the mortgagor now used in connection with the Federal Aid Project 208–A in Glacier county, Montana.'' And on the same day Windsor wrote to the defendant, referring to his contract with Lalonde, Peck and Powers relating to Federal Aid Project 208–A, saying that in consideration of defendant's taking charge of the work and completing the same he would give defendant his active co-operation: ''I further agree that I will turn over to you for use on such work two trucks for gravel use and Ford truck for general use, also the removable parts of the various machinery on such work, also that you may take and use for such work any and all machinery, camp equipment and general supplies that I have now in connection with the work. I agree that you may proceed with such work from this date without interference from me. It is understood that in consideration of the above, that you will render to me an accounting of such work, and after deducting the moneys advanced by you on such work and payment for time and expense in such connection, will deliver to me or my assigns the balance over and above such costs and expenses of all moneys received by you in connection with such work.''

In response, Crichton, defendant's agent, wrote Windsor that in consideration of the agreement contained in Windsor's letter ''we agree that we will take over and complete your contract with Lalonde, Peck and Powers on Federal Aid Project 208–A and complete the same as soon as possible and render a complete accounting of the work, the costs and expenses connected with such completion, that we will complete such work with a minimum expense as though we were working on our own behalf, that we will, at the completion of the work and after our accounting as settlement with Lalonde, Peck and Powers, pay to you or your assigns all surplus received by us in connection with such work over and above the costs and expenses of such completion of such work, it being agreed that our payments to Lalonde, Peck and Powers shall first have your consent and agree that we return or account for all property received from you.'' Continuing, defendant

agreed that certain labor claims should be paid by the defendant. Other statements therein are not important here. It is indeed unlikely, the relations between the two men considered, that plaintiff was not fully cognizant of this entire transaction.

A copy of the subcontract with Lalonde, Peck and Powers, and the application to the Federal Surety Company for a bond, were received in evidence, as was also, over the objection of plaintiff, Windsor's application for a contractor's bond in the sum of $28,500 in favor of Lalonde, Peck and Powers. Plaintiff protested that he had never seen nor heard of Windsor's application for a bond; but he admitted that he knew it was necessary for contractors and subcontractors engaged in such work to obtain bonds. Furthermore, he thought Windsor had told him of the bond given to Lalonde, Peck and Powers before he came to Browning in January.

It appeared that plaintiff had testified in a circuit court in South Dakota in an action pending between Windsor and one Pickus. In that trial he testified that he became connected with Windsor's Montana contracts in 1923. He was asked if, in answer to a question put in the Pickus trial, he did not answer: "I was interested in the whole Montana business." He answered: "I don't know what I testified with respect to that. If I said I was interested in the Montana business it was in behalf of Mr. Windsor; it wasn't in behalf of myself." Later he said: "I was taking over the Montana contract anyway." He referred to Windsor's subcontract on the "Melchert" Birch Creek project.

Windsor testified by deposition as a witness for plaintiff. On cross-examination counsel for defendant asked him whether certain questions were not asked him with respect to Mr. Brown's taking over the Montana contract, to which he had given certain answers. To these inquiries he responded, "I don't remember," or that in substance.

A letter written on the letter-head of C. H. Windsor, general contractor, dated December 10, 1923, was offered in evidence, addressed to H. Pickus Construction Company, Sioux City,

Iowa. This letter was signed, "C. H. Windsor Construction Company, by Paul M. Brown," and was dictated by him. The letter indicates almost irrefutably that plaintiff and Windsor were jointly interested in the Montana contract.

Windsor said it was Brown's idea to include the name of Chester Korthoff in the bill of sale given in January, 1925. Windsor did not owe Korthoff anything. When Windsor left the work in the latter part of 1924 the equipment was left in charge of Milliken, and when he returned he found Milliken in charge of it and took it over from him. He did not know whether he had paid Milliken for keeping the property or not; he believed he did; but he did not pay him anything after plaintiff took it over. All of the foregoing appears in plaintiff's case.

W. R. McDonald, an attorney at law residing at Browning, testified that plaintiff called upon him in the month of January, 1925, regarding a bill of sale for the equipment. McDonald said: "As I recall it he was asking me about the advisability of taking title to himself from Windsor. The purpose of it at that time seemed to be this: He said that Windsor was indebted to him in a considerable amount of money and that he wanted to protect himself. He also said that Windsor had quite a lot of other creditors, and he wanted to protect both himself and the machinery from any attachment against Windsor."

Crichton testified that he bought some scrapers and a new base for the crusher which cost, installed, about $2,000, and also paid about $1,000 repairing the Mack trucks. The Russell Grader Company advised Crichton in the fall of 1925 that the defendant could not use the "stuff" covered by their conditional sales contract unless the company guaranteed their accounts. Ross, agent for the grader company, took possession of the machinery and sold it to defendant for $900, giving a bill of sale therefor. "I had my attention called to the fact that a bill of sale had been filed, and I asked Windsor, 'How about this bill of sale?' or words to that effect. He reassured me and stated that he had technically transferred title to Mr. Brown, but actually he was the owner of the machinery.

He could sell it, rent it, or use it, or do anything with it that he wanted to, and that we should have no fear of what Brown might do, or any action that Brown or anyone else might make on that machinery or on that job.''

Defendant moved for a directed verdict upon eight grounds. The first was that there was a variance amounting to a total failure of proof between the complaint and the proof. This presents a debatable question, to say the least, but we shall pass on to the merits of the controversy. Another ground was that the plaintiff had failed to prove any valid sale of the property from Windsor to himself, and another was that the evidence shows that the alleged bill of sale is fraudulent as a matter of law and therefore void.

Supposing, not deciding, that the evidence shows a valid sale between Windsor and plaintiff, we are satisfied that the court was right upon the last ground mentioned above. Section 8604, Revised Codes of 1921, provides in part that every transfer of personal property ''is conclusively presumed, if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual or continued change of possession of the things transferred, to be fraudulent, and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of his creditors, and against any persons on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or encumbrancers in good faith subsequent to the transfer.'' Defendant was a creditor within the meaning of the statute.

''According to the weight of authority a contingent liability is as fully protected against fraudulent and voluntary conveyances as a claim certain and absolute, and whoever has a claim or demand arising out of a pre-existing contract, although it may be contingent, is a creditor whose rights are affected by such conveyances and can avoid them when the contingency happens upon which the claim depends.'' (27 C. J. 473, note 25, citing many cases.)

400

When the bill of sale was signed, January 27, 1925, defendant was the surety on Windsor's bond to secure the performance of the subcontract between Lalonde, Peck and Powers, and himself. It is admitted by plaintiff that Windsor was the owner of all the property mentioned in the bill of sale at the time it was executed, although the record does not bear out that to the full. According to the following authorities, the application for the bond, whereby Windsor assigned all of the property to the defendant, constituted a chattel mortgage as between Windsor and the surety company. (*St. Louis Clay Products Co.* v. *Christopher*, 152 Wis. 603, 140 N. W. 351; *Commercial Casualty Ins. Co.* v. *Williams*, (C. C. A.) 37 Fed. (2d) 326; *In re Schilling*, (D. C.) 251 Fed. 966; *Title Guaranty & Surety Co.* v. *Witmire*, (C. C. A.) 195 Fed. 41; *Massachusetts Bonding & Ins. Co.* v. *Kemper*, (C. C. A.) 220 Fed. 847; and see secs. 8202 and 8207, Rev. Codes 1921.) The contingent undertaking by the surety company grew into a serious affair, at one time involving the surety company, according to Crichton's testimony, to the extent of $39,000.

Notwithstanding the fact that plaintiff testified that he went to Browning in 1925 and took possession of the property, it is clear to us that there was not, within the meaning of the statute, an immediate delivery followed by an actual and continued change of possession of the things transferred in so far as the creditors of Windsor were concerned.

The testimony introduced by plaintiff shows that he held himself out to be an employee of Windsor during the period of time Windsor was working on the Birch Creek project, and that Milliken was at that time foreman for Windsor; that Windsor left the property in the custody and control of Milliken; when plaintiff arrived at Browning in 1925 some of the machinery was stored in Browning; plaintiff brought in some blades and the like, which he stored in Browning, but there is nothing to show that he did not store that in the same place where the other machinery was. The crusher he

left upon the road. Repairs were made on some of the machinery under the direction of Milliken. When plaintiff left for the east, never to return until after Windsor had resumed work with this same machinery, Milliken was left in charge of it.

There was nothing in the actions of plaintiff when he was at Browning in January and February, 1925, to indicate that he was other than an employee of Windsor, which he had always proclaimed himself to be. He did not give any notice to the world that he had changed from an employee of Windsor to the owner of the equipment. As we said in *O. W. Perry Co.* v. *Mullen,* 81 Mont. 482, 56 A. L. R. 514, 263 Pac. 976, 977: "The object of the statute is to require notice to the world of the transfer of personal property in order that creditors, and purchasers or incumbrancers in good faith, may be protected. It is designed to prevent fraud. It requires the surrender of control by the vendor and the assumption of possession by the vendee, and mere words are not sufficient to constitute the delivery contemplated. (*Dover Lumber Co.* v. *Whitcomb,* 54 Mont. 141, 168 Pac. 947; *Wells* v. *Esgar,* 72 Mont. 333, 233 Pac. 123.)"

The mere delivery of a bill of sale is not any more potent than are mere words. Generally speaking, as between the parties, a delivery is not essential to complete a sale, but as to creditors it is absolutely indispensable. (Note to *Claflin* v. *Rosenberg,* 97 Am. Dec. 347.)

"It is the general rule that, to defeat the claim of the creditor of the vendor, the change of possession must be so open and so long continued as to indicate to the world at large that there has been a transfer of title." (*Puckett* v. *Hopkins,* 63 Mont. 137, 206 Pac. 422, 423; *O. W. Perry Co.* v. *Mullen,* supra; *Dodge* v. *Jones,* 7 Mont. 121, 14 Pac. 707; *Hurlburd* v. *Bogardus,* 10 Cal. 518.)

In *Taylor* v. *Malta Mercantile Co.,* 47 Mont. 342, 132 Pac. 549, 552, this court said: "But in *Dodge* v. *Jones* this court quoted with approval from *Stevens* v. *Irwin,* 15 Cal. 503, 76 Am. Dec. 500, the following: 'The delivery must be made of

the property; the vendee must take the actual possession; that possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. It must be such as to give evidence to the world of the claims of the new owner. He must, in other words, be in the usual relation to the property which owners of goods occupy to their property. This possession must be continuous—not taken to be surrendered back again—not formal, but substantial.' This doctrine was repeated in *Morris* v. *McLaughlin,* above [25 Mont. 151, 64 Pac. 219], decided after *Cady* v. *Zimmerman* [20 Mont. 225, 50 Pac. 553], and in that case the further language of the California court in construing a statute like our 6128 was adopted: 'The word "actual" was designed to exclude the idea of a mere formal change of possession, and the word "continued," to exclude the idea of a mere temporary change.'" (And see *Mosgrove* v. *Harris,* 94 Cal. 162, 29 Pac. 490; *Crouch* v. *Carrier,* 16 Conn. 505, 41 Am. Dec. 156.)

In *Second National Bank* v. *Gilbert,* 174 Ill. 485, 66 Am. St. Rep. 306, 51 N. E. 584, 585, the court said: "When the known and previously recognized agent of an alleged vendor remains in possession of personal property, the appearance to the world is the same as though the vendor himself remained in possession, unless there are substantial and visible signs of a change of title. The change in the character of the possession should be indicated by such outward, open, actual, and visible signs as can be seen and known to the public, or persons dealing with the property."

Counsel for plaintiff argue that plaintiff observed the statutory requisite by taking possession, and retaining Milliken as his employee to continue in custody, of the property; but the authorities are against the point. Mere notification of a servant in charge that personal property has been sold, accompanied by a request by the purchaser to continue in his employment, is not such a delivery or change of possession as will vest the property in the purchaser as against creditors of the party from whom he bought. (*Sleeper* v. *Pollard,* 28 Vt. 709, 67 Am. Dec. 741; 27 C. J. 588.)

If the pretended sale was void because of fraud in law, notice of the bill of sale is not material as against an existing creditor under the conditions proven. Whether there was fraud in law was, as a matter of course, a question for the court. (*Weil* v. *Paul*, 22 Cal. 492; *Sweetland* v. *Oakley State Bank*, 40 Idaho, 726, 236 Pac. 538.) It follows that the court was constrained to grant the motion for a directed verdict in favor of the defendant.

Other grounds supporting the trial court's action are advanced in respondent's brief, some of which seem meritorious, but it is not necessary to discuss them.

The judgment is affirmed.

ASSOCIATE JUSTICES GALEN, FORD, ANGSTMAN and MATTHEWS concur.