## Morris Rosenbaum, *et al vs.* Jerry Hayes.

### Opinion filed June 14, 1901.

### Factor's Lien—Possession.

The factor's lien provided for in § 4836, Rev. Codes, is dependent upon the possession of the property upon which the lien is claimed. The possession required to sustain such lien is sufficient if it appears that the property is so appropriated to the factor that it is assuredly under his control. Just what will constitute a sufficient assumption of possession by the factor must depend largely upon the kind and nature of the property, the situation of the parties, and other circumstances peculiar to each case.

### Plaintiff in Control of Property.

On a trial de novo in this court it is found that the evidence establishes the possession and the control of the sheep in controversy in plaintiffs under a factor's lien at the time they were seized by defendant under a writ of attachment directed against the property of the owner thereof.

### Sunday Transfer—Valid When Executed.

It is *held* that the fact that the factor acquired possession of the property on Sunday will not defeat his possession or lien based thereon. A Sunday transfer of property, even when prohibited by law, is effective so far as executed. The law merely refuses to lend its aid to enforce executory features of the contract, or to help the parties to regain their former position. It requires them to remain in the position in which they have placed themselves. A creditor of the owner has no other right than the owner. Whether the transfer of possession in this case constituted "servile labor" or "trade," within the meaning of § § 6841, 6842, Rev. Codes, and is prohibited, is not determined.

### Factor's Lien—How Waived.

A factor's lien is waived by a special agreement inconsistent with the continuance of the lien, such as an extension of time of payment beyond the period when the lien would naturally terminate; or by an intentional waiver, such as the acceptance of other security with intent to rely upon it exclusively, or an agreement to look to the personal responsibility of the debtor. It is *held*, on the facts of this case, that the time of payment was not extended; neither did plaintiffs waive their lien by taking other security; nor did they at any time waive the lien by relying upon the personal responsibility of the debtor.

### Assignment of Factor's Lien Not Involved.

Plaintiffs took possession of the sheep in controversy under the present claim and delivery proceedings on August 11, 1893. Two days later the defendant rebonded, and regained possession. On November 20, 1893, defendant sold the sheep, and transferred title. It is claimed that an assignment of the factor's lien was made by the factor on January 1st thereafter. *Held*, that the rights of the parties had become fixed prior to the alleged assignment, and that the lien was merged in the present cause of action. Accordingly, the question of the assignability of a factor's lien is not involved.

**Complaint Sustained by Evidence.**

> Evidence examined, and found to establish the balance due the plaintiffs as factors at the amount demanded in the complaint.

Appeal from District Court, Morton County; *Fisk, J.*

Action by Morris Rosenbaum and others against Jerry Hayes, sheriff. Judgment for plaintiffs, and defendant appeals.

Affirmed.

*James B. Kerr, Alexander Hughes* and *George W. Newton,* for appellants.

This case has been twice before the court. *Rosenbaum v. Hayes,* 5 N. D. 476; *Rosenbaum v. Hayes,* 8 N. D. 461. Possession of the sheep, by the plaintiffs, upon the range during the summer would not be sufficient to create a lien in favor of the plaintiffs as factors for the reason that a factor has a lien only upon such property of his principal as comes into his hands in the ordinary course of business as a factor. 2 Kents Com. 637; 2 Parsons Cont. (8 Ed.) 99; *Dixon v. Stansfield,* 10 C. B. 399; *Stevenson v. Blakelock,* 1 M. & S. 535; § § 4836, 4134, 4353, Rev. Codes; § § 4442, 3791, 4010 Comp. Laws; Whart. Agcy. § 735; 3 A. & E. Enc. L. 318, Note 2. A factor must be a specialist pursuing the particular business as a trade. One who undertakes to sell a piece of goods out of his line of business is not, therefore, a factor. *Bank v. Jones,* 4 N. Y. 497; Benjamin on Sales, 38; *Thatcher v. Moors,* 134 Mass. 156. Possession is essential to create, and essential to preserve a lien at common law. The right begins and ends with possession. Jones on Liens, § 21; *Bank v. Janin,* 46 La. Ann. 1001; *Hinchman v. Lincoln,* 124 U. S. 38. Conceding that all the testimony offered by the plaintiffs as to the transaction on the prairie is true, yet it is clear that there was no such change of possession as would pass the title between the parties on sale. *Hinchman v. Lincoln,* 124 U. S. 38; *Shindler v. Houston,* 1 N. Y. 261; *Edwards v. Meadows,* 71 Ala. 42; *Hollenbeck v. Cochran,* 20 Hun. 416. Any delivery upon the prairie on August 6th conferred no rights for the reason that the transaction was in violation of the Sunday law. § § 6241, 6242, 6245, Comp. Laws; *Smith v. Wilcox,* 24 N. Y. 353; *Link v. Clemens,* 7 Blackf. 479; *Reynolds v. Stevenson,* 4 Ind. 619; *Cincinnati v. Rice,* 15 O. St. 225; Note 14 L. R. A. 192; *Smith v. Foster,* 41 N. H. 215; *Moseley v. Hatch,* 108 Mass. 519; *Finley v. Quirk,* 9 Minn. 194; *Durant v. Rhenier,* 26 Minn. 302, 4 N. W. Rep. 610; *Brackett v. Edgerton,* 14 Minn. 174; *Gibbs, Etc. Co. v. Brucker,* 111 U. S. 597, 601; *Vinz v. Beatty,* 61 Wis. 645. The transfer was fradulent and void as against creditors because not accompanied by and followed by an actual and continued change of possession. § 4657 Comp. Laws; *Conrad v. Smith,* 2 N. D. 412; *McFarland v. Wheeler,* 26 Wend. 467. The amendment of § 4657, Comp. Laws by Chap. 78 of the Laws of 1893, which changes the rule of presumption from a conclusive to a rebuttable presumption, only relates to sales and not

to liens. The policy of the law which requires a visible possession to support a lien is found in the re-enactment of § 4345, Comp. Laws as § 4698, Rev. Codes. *Newell* v. *Wagness,* 1 N. D. 62; *Conrad* v. *Smith,* 2 N. D. 408; *Morrison* v. *Oium,* 3 N. D. 76; *Bank* v. *Janin,* 46 La. Ann. 1001; *McFarland* v. *Wheeler,* 26 Wend. 467; *Flanagan* v. *Wood,* 33 Vt. 327. The claim of the plaintiffs against the Beasleys has been assigned, and any lien is extinguished. The lien or right to a lien cannot be assigned. Jones on Liens, § 982; *Tewksbury* v. *Bronson,* 48 Wis. 581, 4 N. W. Rep. 749; *Gage* v. *Allison,* 2 Am. Dec. 682; *Ames* v. *Palmer,* 66 Am. Dec. 271; *Holly* v. *Huggeford,* 19 Am. Dec. 303. The recovery must be limited to the special interest of the plaintiffs in the property. *Tewksbury* v. *Bronson,* 48 Wis. 581, 4 N. W. Rep. 749; Suth rland on Damages, § 1160; *Deal* v. *Osborne,* 42 Minn. 102; *Wheeler* v. *Train,* 4. Pick. 168. By § 229 of the Montana statute, the mortgages executed at Chicago were fraudulent. They were a part of the same transaction with the execution of the paper at Dickinson. The law in force at the time and place when and where a contract is entered into, and where it is to be performed, enters into and becomes a part of it. *Walker* v. *Whithead,* 16 Wall. 314; 21 L. Ed. 57; *Ogden* v. *Saunders,* 12 Wheat. 213; 6 L. Ed. 606; *Cook* v. *Moffat,* 5 How. 312, 12 L. Ed. 167; Bishop. Cont. 554, 567. The statute law of another state will be enforced, if not against public policy, when such law has entered into a contract. *Bucher* v. *Gregory,* 9 Mo. App. 102; *Cobb* v. *Griffith,* 12 Mo. App. 130. The repeal of § 4657, Comp. Laws of North Dakota, by Chap. 78, Laws of 1893, did not repeal the statutes of Montana. The Montana statutes were the law of the contract and could not be changed so as to affect the note in question, or Gans' rights thereunder, even by the legislature of Montana. *Conrad* v. *Smith,* 6 N. D. 337; *Bosher* v. *Berry,* 6 Mont. 448; *Harmon* v. *Bank,* 18 Mont. 525; *Merchants Nat. Bank* v. *Greenhood,* 16 Mont. 395, 453. The Montana statute forming a part of the contract, this court should enforce it. *Flash* v. *Conn.,* 107 U. S. 371, 381; 29 L. Ed. 966; *Jessup* v. *Carnegie,* 80 N. Y. 441.

*Ball, Watson & Maclay, A. B. Melville* and *J. G. Campbell,* for respondents.

It is an undisputed fact in the case that it was the custom in 1893, in the shipment of sheep to eastern markets, to feed them in transit on the range. This fact is sufficient answer to appellant's contention that the sheep did not go into plaintiffs' possession in the usual course of business. A factor may prepare as well as keep property for sale on the market. *Bank* v. *Schween,* 127 Ill. 573; *State* v. *Thompson,* 120 Mo. 12; *Shaw* v. *Ferguson,* 78 Ind. 547, 554. The delivery of possession was sufficient. *Sumner* v. *Hamlet,* 29 Mass. 26; *Cady* v. *Zimmerman,* 20 Mont. 225; *Dodge* v. *Jones,* 7 Mont. 121; *Rice* v. *Austin,* 17 Mass. 197; *Williams* v. *Lerch,* 56 Cal. 334 *Montgomery* v. *Hunt,* 5 Cal. 369; *Goodwin* v. *Goodwin,* 90 Me. 23; *Brown* v. *Wade,* 42 Ia. 647; *Garretson* v. *Hackenberg,* 144 Pa. St.

107; *Bell* v. *McClosky,* 155 Pa. St. 319; *Webster* v. *Anderson,* 42 Mich. 554; *Tunell* v. *Larson,* 39 Minn. 269; *Stanley* v. *Robbins,* 36 Vt. 422; *Stevenson* v. *Clark,* 40 Vt. 624; *Godchaux* v. *Mulford,* 26 Cal. 316, 324 et seq.; *Parks* v. *Barney,* 55 Cal. 239; *Humphreys* v. *Harkey,* 59 Cal. 626; *Morgan* v. *Miller,* 62 Cal. 492; *Meads* v. *Lasar,* 92 Cal. 221; *Porter* v. *Bucher,* 98 Cal. 454; *O'Brien* v. *Ballou,* 116 Cal. 318; *Adams* v. *Weber,* 117 Cal. 42; *Williams* v. *Borgwardt,* 119 Cal. 83; *Asbill* v. *Standley,* 31 Pac. Rep. 738; *Clute* v. *Steele,* 6 Nev. 335; *State* v. *Flynn,* 56 Mo. App. 236; *McGuire* v. *West,* 43 S. W. Rep. 458; *Grenthal* v. *Lincoln,* 68 Conn. 384; *Warner* v. *Carlton,* 22 Ill. 424; *Grady* v. *Baker,* 3 Dak. 298. The transactions at Dickinson on August 6th amounted to a sufficient change of possession of the sheep to satisfy the requirements even of the Montana statutes. *Cady* v. *Zimmerman,* 20 Mont. 225; *Dodge* v. *Jones,* 7 Mont. 121. The Montana statute was not such a part of the substantive law as to prevent the legislature from altering it so as to affect contracts made prior to such amendment so long as the parties to such contracts had obtained no specific right or title to the property affected by the amendment, or any lien upon it by attachment, or otherwise. *Conrad* v. *Smith,* 6 N. D. 337. The bill of lading, freight receipts and way bills were admissible upon the question of the intent of the parties, as well as upon the question of delivery of possession. It was not necessary to show the authority of the railroad agent to issue them either as against the company or a third person. *Hanson* v. *Ry. Co.,* 41 N. W. Rep. 529; *Brooks* v. *Ry. Co.,* 21 A. & E. R. R. Cas. 64. They were admissible even though not authorized. *Prince* v. *Ry. Co.,* 101 Mass. 542; *Bryan* v. *Nix,* 4 M. & W. 775. The transfer of plaintiffs' claims to Rosenbaum Bros. & Co., was proved in cross-examination, over objection, and was outside the line of examination in chief. *Kaeppler* v. *Bank,* 8 N. D. 406. This transfer did not include the claims in litigation. But even if established that plaintiffs are not now the owners of the cause of action, the case should continue in the name of the original party. § 5234, Rev. Codes; *Johnson* v. *King,* 58 N. W. Rep. 1105; *Moss* v. *Shear,* 30 Cal. 469; *Camerillo* v. *Fenton,* 49 Cal. 203; *Alexander* v. *Overton,* 72 N. W. Rep. 212. The factor's lien law descends to and can be enforced by the personal representative of the factor, or by his assignee in insolvency. This is enough to show that the right is not a purely personal right. 10 A. & E. Enc. L. (2 Ed.) 687, Notes 2 and 3. No such important distinction exists between the factor's lien and other common law liens dependent upon possession as should differentiate them with respect to the right of assignability. *Nash* v. *Mosher,* 19 Wend. 431; Jones on Pledges, § 331; *Sibley* v. *Willard,* 17 N. W. Rep. 337; *Tuttle* v. *Howe,* 14 Minn. 145; *Duncan* v. *Hawn,* 37 Pac. Rep. 626; *DeWitt* v. *Prescott,* 16 N. W. Rep. 656. While the form of the present action is replevin, as the property has been sold and disposed of and cannot be returned to the plaintiff, an alternative judgment would be unnecessary and unavailing. *Boley* v. *Griswold,* 20 Wall. 486; *Brown* v. *Johnson,*

45 Cal. 76. The action is changed, so far as practical results are concerned, into an action for conversion. *Brewster* v. *Carmichael,* 39 Wis. 456; Cobbey on Replevin, § 852. The rights of all the parties were fixed at the time the defendant gave the redelivery bond and took back the sheep. *Union Nat. Bank* v. *Moline, Milburn & Stoddard Co.,* 7 N. D. 219, 222. After suit is begun, when the rights of the parties have become fixed, an assignment will not destroy the right of action. *Tuttle* v. *Howe,* 14 Minn. 149. Assuming that the transfer to the corporation were proved, it would be a transfer in name only and not in substance. Under such circumstances the court will consider substance and not form. *New York Bank Note Co.* v. *Bank Note Co.,* 50 N. Y. Supp. 1093, 1099. The taking of collateral security was not, as a matter of law, a waiver of the lien, there being no evidence tending to show an intent to waive it. 28 A. & E. Enc. L. 526, 529. The intention to waive a lien must be express or the implication must be very clear and plain. The presumption is always against it. *Lambert* v. *Nicklass,* 31 S. E. Rep. 951; *Howe* v. *Kindred,* 44 N. W. Rep. 311; *Mines* v. *Seymour,* 153 U. S. 509, 517; *Brisco* v. *Mining Co.,* 82 Fed. Rep. 952; *Kilpatrick* v. *Ry. Co.,* 57 N. W. Rep. 664; *Ford* v. *Wilson,* 11 S. E. Rep. 559; *Chicago Etc. Ry. Co.* v. *Rolling Mill,* 109 U. S. 702. Taking a mortgage upon the same property does not necessarily waive the lien. Jones on Liens, § § 1011, 1013; *Joslyn* v. *Smith,* 2 N. D. 53; *Chapman* v. *Brewer,* 62 N. W. Rep. 320; *Bank* v. *Taylor,* 4 S. W. Rep. 876, 880; *Payne* v. *Wilson,* 74 N. Y. 348; *Gilchrist* v. *Gottschalk,* 39 Ia. 311; *The D. B. Steelman,* 48 Fed. Rep. 589; *Taylor* v. *Fryar,* 44 S. W. Rep. 183; *Clark* v. *Moore,* 64 Ill. 273; *Roberts* v. *Wilcoxson,* 36 Ark. 355; *Franklin* v. *Moyer,* 36 Ark. 96; *Rollins* v. *Proctor,* 9 N. W. Rep. 235; *Ladner* v. *Balsley,* 72 N. W. Rep. 787; *Block* v. *Lathen,* 63 Tex. 414; *Angus* v. *McLachlan,* L. R. 23 Ch. D. 330, 334, 335; *The Ellen Holgate,* 30 Fed. Rep. 125; the *D. B. Steelman,* 48 Fed. Rep. 580; the *Gate City,* 5 Biss. (U. S.) 200; *Page* v. *Edwards,* 23 At. Rep. 917; *Remick* v. *Ludvigton,* 16 W. Va. 378. *Powell* v. *Smith,* 20 So. Rep. 872. The retaining of title to the property itself does not necessarily waive the lien. *Peninsular Co.* v. *Norris,* 59 N. Y. 151; *Manf. Co.* v. *Smith,* 40 Fed. Rep. 339; *Manf. Co.* v. *Hunter,* 15 Neb. 32. The rule against the admission of parole testimony to vary the terms of a written instrument is applied only in controversies between the parties to a contract, or their privies or representatives. Best Ev. § 225; *Iron Co.* v. *Green,* 88 Fed Rep. 207; *Sigafus* v. *Porter,* 84 Fed. Rep. 430; *Hussman* v. *Wilke,* 40 Cal. 250; *Dempsey* v. *Kipp,* 61 N. Y. 462; *McMaster* v. *Ins. Co.,* 55 N. Y. 222; *Gaar, Scott & Co.* v. *Green,* 6 N. D. 48. The fact that plaintiffs accepted the mortgages does not raise a presumption that they extended the time of payment to the date named in the mortgage, or that they thereby agreed to extend the time. *Borden* v. *Bank,* 144 U. S. 97; *United States* v. *Hodge,* 6 How. 281; *Cary* v. *White,* 52 N. Y. 138; *Brengle* v. *Bushey,* 17 Am. Rep. 586; *Fisher* v. *Bank,* 45 Pac. Rep. 440; *Ripley* v. *Greenleaf,* 2 Vt. 129;

*Benton* v. *Bank,* 64 N. W. Rep. 227; *Shaw* v. *Church,* 39 Pa. St. 226; *Elwood* v. *Diefendorf,* 5 Barb. 398; *Bank* v. *Ives,* 17 Wend. 501.

YOUNG, J. This action was commenced in the District Court of Stark county on August 1, 1893, to recover the possession or value of 5,600 sheep owned by Beasley & Co., which sheep the defendant seized and took into his possession four days prior thereto, as sheriff of said county, under a warrant of attachment issued out of said court at the suit of Joseph Gans against the property of said Beasley & Co. Such proceedings were had by plaintiffs that the sheep in question were taken possession of by the county coroner of said county at the date of the service of the summons and complaint herein. Within the time allowed by law, viz. on August 13, 1893, the defendant executed a redelivery bond, and was restored to possession. On November 20, 1893, and before trial, the sheep were sold under an order of said court procured by defendant, since which date plaintiffs' only available relief has been confined to a recovery of the value of the sheep. At the times here in question the plaintiffs were live stock commission merchants, with headquarters in the city of Chicago, and as such were engaged in receiving consignments of stock for sale, and making advances thereon to local buyers, according to the custom of such business. Beasley & Co., a co-partnership composed of W. W. Beasley and his two sons, Nat C. Beasley and George M. Beasley, were engaged in the business of buying sheep in the west, and shipping them to plaintiffs to be sold on commission. The money for their purchases was furnished by plaintiffs. Plaintiffs claim that on the date the sheep in question were seized by the defendant, Beasley & Co. were indebted to them in the sum of $16,163.07 for advances. Joseph Gans, at whose instance the defendant seized the sheep, is a creditor of Beasley & Co., and resides in Montana. The amount of his claim at the date of the attachment was about $10,000. Plaintiffs allege that the relation of factor and principal existed between them and Beasley & Co., and that on the date of the seizure plaintiffs were in possession of the sheep in question as such factor, and were, therefore, entitled to retain such possession by virtue of a factor's lien thereon to secure the balance due for advances theretofore made to Beasley & Co. The defendant denies the existence of the lien, and claims that the sheep, when attached, were in the possession of the owners, Beasley & Co., and not in the possession of plaintiffs. Four trials have been had in the District Court, and this is the third appeal to this court. By consent the last trial in the District Court, from which the present appeal is prosecuted, was to the court without a jury, under the provisions of § 5630, Rev. Codes. Plaintiffs were successful. Judgment was ordered and entered in their favor for a return of the sheep, or for the amount found to be due on the claim secured by their alleged lien, with interest and costs, amounting in the aggregate to the sum of $25,523.58. Defendant has appealed from such judgment, and in a

settled statement of case, containing all of the evidence offered in the trial court, has demanded a review of.the entire case in this court.

The first and most important question of fact to be considered relates to the possession of the property in controversy at the date of the attachment. The factor's lien, which furnishes the sole basis of plaintiffs' demand, exists only when coupled with the possession of the property on which the lien is claimed. Section 4836, Rev. Codes. Accordingly, if plaintiffs did not in fact have such possession of the property in question, on the date of the seizure, as would sustain such lien, they must fail in this action. It appears that the sheep were purchased in Montana, and were shipped to Dickinson, in Stark county, in April 1893, and were put upon the range at that point pursuant to an arrangement made by plaintiffs with the railroad company, which arrangement permitted plaintiffs to stop them in transit for feeding and grazing purposes, on a through rate tariff. The complaint, in substance, alleges that on April 11, 1893, the plaintiffs had, and ever since have had, a factor's lien on said sheep; that Beasley & Co. were engaged at said date in shipping stock to plaintiffs, as commission merchants at Chicago, Ill.; that upon said date plaintiffs had advanced to Beasley & Co. $16,163.07 on account of the shipment of said sheep and other live stock; that they were indebted to plaintiffs in that amount; that said sheep were taken off the cars in transit at Dickinson, N. D., and were in plaintiffs' possession as commission merchants and factors for purposes of sale; that, in addition to said factor's lien, it was expressly agreed by Beasley & Co. that the plaintiffs should have a factor's lien on said sheep for the general balance of $16,163.07; and that the possession of said sheep was transferred to the plaintiffs, and by them held at the time they were attached, on August 7, 1893. The answer admits the seizure, sets up the fact that the same was made under a warrant of attachment duly issued against the property of Beasley & Co., and alleges that the sheep were found in the possession of Beasley & Co., and were levied on as their property, and that such sheep were their property. It is a conceded fact that the sheep were owned by Beasley & Co. The question in dispute relates solely to the possession. Were they in the possession of plaintiffs or of Beasley & Co. when seized? The answer to this question will turn upon the effect to be given to certain acts relative to the possession of said sheep, which occurred in the three days immediately preceding the seizure by defendant. It is claimed by plaintiffs that during said time the possession of the sheep was delivered to them by Beasley & Co., and that they assumed the exclusive possession and control thereof, and had such possession and control when they were attached. To gain an intelligent understanding of the situation of the parties and the evidence on this point, it becomes necessary to narrate some preliminary facts. On April 11, 1893, Beasley & Co. owned 8,200 sheep, all of which, except 10 car loads, had been wintered at or near Rosebud, Mont. The sheep at Rosebud, which did not include the 10 car loads, were in three bands; one kept by a herder named Charles

W. Smith, another by a herder named Isaac Hodges, and the third
by a herder named Harvey Willcutt. The 10 car loads referred to
were purchased by Beasley & Co. on April 3, 1893, at Big Timber,
Mont., for $9,500, which sum was advanced to them on said date by
plaintiffs for such purchase. These 10 cars were loaded for ship-
ment to Dickinson, in Stark county, but were stopped in transit at
Rosebud, unloaded, and fed, and on April 9th or 10th were reloaded,
and 10 cars loads added from the sheep wintered at Rosebud, making
a train load of 20 cars, and all were shipped to Dickinson. Nat C.
Beasley had the care and custody of the sheep on this train, assisted
by Charles W. Smith and a herder named David Tetters. These
sheep were unloaded at Dickinson, and left in the custody of Smith
and Tetters. On the following day Nat C. Beasley returned to Rose-
bud with the same cars, and loaded the remaining sheep, 20 cars in
all; also the camp equipage, which had been in use at Rosebud, and
returned to Dickinson. The sheep on this train were in the care
of W. W. Beasley and Nat C. Beasley, assisted by the two remain-
ing herders, Isaac Hodgins and Harvey Willcutt. A summer range
was located on the Cannon Ball river, and the sheep were divided
into three bands, and placed in charge of the herders who had accom-
panied them from Montana. Isaac Hodges kept one band, Harvey
Willcutt another, and David Tetters the third. Charles W. Smith
was placed in general charge of the three camps. When the last
train load was on the cars at Rosebud, the agent of the railroad
company at that point, at the request of the Beasleys, issued a bill
of lading for the entire 40 cars, and delivered the same to them.
So far as important it is as follows: "Rosebud, Montana, April 11th,
1893. Received from Geo. M. Beasley & Co., in apparent good con-
dition. * * * 40 cars sheep. * * * Consignee, Rosenbaum
Bros. & Co. * * * Destination, Dickinson, N. Dak. S. L. C.
Contract. * * * Northern Pacific Railroad, by H. Morrow,
Agent." The word "contract" indorsed on the bill of lading means
that the shipment is made under a live-stock contract. This contract
is in evidence, and shows that the care and control of the sheep, with
right to unload and feed during transportation, was in the consign-
ors, Beasley & Co. The bill of lading showing the consignment to
plaintiffs was at once forwarded to them at Chicago. At the date
of the shipment from Montana to Dickinson, Beasley & Co. drew a
draft on the plaintiffs for sufficient money to pay the freight charges,
and also $200 to cover expenses of men and hotel bills, which draft
was paid. On the arrival of the sheep at Dickinson, W. W. Beasley
introduced the head herder, Charles W. Smith, to J. L. Dickinson,
a merchant in that place, and informed him that Smith was in
charge of a band of sheep in transit to Chicago to the stock firm of
Rosenbaum & Co., and requested him to let Smith have supplies,
and to send his bills to Rosenbaum Bros. & Co., who, he said, would
pay the same. About June 1, 1893, the Beasleys caused the sheep
to be brought into Dickinson, where they were sheared at their ex-
pense. The wool was shipped to Boston in their name and sold.

They received the proceeds, amounting to about $6,600. In July, Geo. M. Beasley had the sheep again driven to Dickinson, where he selected out about 2,200 head, which he shipped to Rockefeller, Ill., accompanied by the herder Harvey Willcutt. There is some evidence tending to show that this band, after being fed for a time at Rockefeller, were shipped to Chicago; but this is not entirely clear. The sheep remaining on the range were divided into two bands. One was about six or seven miles south of Dickinson, in the custody of Tetters; the other, probably 25 miles south, in the custody of Hodges. Charles W. Smith had charge of the two camps as before.

This was the situation on August 4, 1893, when the alleged turning over occurred upon which plaintiffs base their present claim of possession. There can be no doubt that both plaintiffs and Beasley & Co. firmly believe that the bill of lading to which reference has been made gave to plaintiffs the exclusive possession and control of said sheep from and after the time they were loaded on the cars in Montana. In this they were mistaken. On the first appeal (*Rosenbaum* v. *Hayes*, 5 N. D. 476, 67 N. W. Rep. 951) this court held that the bill of lading was not conclusive on the question of the intent of the owners to deliver possession to plaintiffs, in view of the other facts in the case showing that the delivery was of a qualified possession only. On the second appeal (*Rosenbaum* v. *Hayes*, 8 N. D. 462, 79 N. W. Rep. 987) this court further held that the shearing in June, and shipment of sheep to Rockefeller in July, by the Beasleys, which plaintiffs either knew or were bound to know, was entirely inconsistent with their claim of possession made by plaintiffs, and operated in law to forfeit any lien which they may have theretofore had. After a careful examination of the evidence, which differs in no important particular from that now before us, we then reached the conclusion that a verdict for plaintiffs could not be sustained, based upon any possession upon their part prior to August 4, 1893, and we still hold the same view. But we also held that the evidence as to the possession acquired by plaintiffs on and after August 4, 1893, was of sufficient weight to entitle plaintiffs to go to the jury on that question. This conclusion we adhered to upon a petition for rehearing. See *Rosenbaum* v. *Hayes*, 8 N. D. 471, 79 N. W. 987. The trial court at the last trial expressly found "that on the 7th day of August, 1893, the plaintiffs were in the actual possession of said sheep, and were driving them to Dickinson for the purpose of shipping them to Chicago, to be sold by plaintiffs as commission merchants, when they were attached and seized by the defendant." If this were the finding of a jury, it goes without saying that it would have to be sustained; for, as we have already seen, upon a former review of substantially the same facts we held that they were sufficient to take the disputed question of possession to the jury. But the present appeal calls for more than our judgment as to the sufficiency of the evidence to sustain the finding, and demands an independent determination of that question at our hands under the pro-

visions of § 5630, Rev. Codes. Our deliberations on the evidence on the point now under consideration have led us to the same conclusion announced by the trial court in the finding above quoted, namely, that the sheep in question were in plaintiff's possession when seized by defendant. It appears that one J. P. Smith, who was the general western agent of plaintiffs, in charge of their business in North Dakota and Montana, was in Montana on the 3d of August, 1893. At that time Joseph Rosenbaum, a member of the plaintiff's firm, was also in Montana. When returning to Chicago, he fell in on the train with Joseph Gans, who was on his way to see the Beasleys about the amount they owed him. During their conversation it was disclosed that both were creditors of the Beasleys, but as to the exact amount due to each their language was somewhat guarded and equivocal. Gans stated to Rosenbaum that he understood the Beasleys had about 30 loads of sheep which they were about to load and ship, and he was going down to Rosebud to see whether they were shipping. Rosenbaum informed him that, if there were any sheep to be loaded at Rosebud, they would be for him; that he did not know of any one else loading there. Later they met plaintiff's general agent, Smith, at the train at Forsythe, at which time Rosenbaum informed Gans where the sheep were, and that they were in plaintiff's possession, both by virtue of the bill of lading and by actual custody. Rosenbaum told Gans that, if he was "up to any law suit or devilment," he "would stay by him." He says: "I instructed my man Smith, in the presence of Gans, to stay by him. Gans says, 'I have no intention of doing anything, because I know Beasley will pay me.'" Rosenbaum continued his journey to Chicago, leaving the entire matter in the hands of Smith. It is shown that Smith at once went to Dickinson, and interviewed George Beasley, and had the latter execute and deliver to him the following instrument, which is known in the record as "Exhibit 82:" "Northern Pacific Railroad Company. Station 189—. Dickinson, N. D., August 4th, 1893. I this day turn over to Rosenbaum Bros. & Co. all of my sheep, which is about (6,000) six thousand head, now ranging on the Cannon Ball. Sheep are all branded with a red bar on the back, thus: I. George M. Beasley & Co." We fully agree with the finding of the trial court "that the purpose of Beasley & Co. and of the plaintiffs, in the making and acceptance of said writing, was in part to furnish and to place in existence at that time visible evidence of plaintiff's claim on the sheep as factors for Beasley & Co., and to fortify and sustain plaintiff's possession and right to the possession of said sheep. And we may add that, as between the parties to said instrument, it had the legal effect of terminating any right of possession which may have theretofore existed in Beasley & Co., and vesting the same exclusively in these plaintiffs. The fact is also established that J. P. Smith, after obtaining Exhibit 82, above set out, went to the railroad office at Dickinson, and ordered 30 cars to ship the sheep to Chicago; stating that the cars would be needed as soon as they could

get the sheep in. It is also shown that on the morning of August 6th—which was Sunday—J. P. Smith went to the sheep camps for the purpose of taking possession of the sheep for plaintiffs. On this trip he was accompanied by W. W. Beasley and one Frank Knigge, of Rockefeller, Ill., who was a friend of George Beasley, then visiting in North Dakota. At the first camp, nearest to Dickinson, they found the chief herder, Charles W. Smith, and the herder David Tetters. Beasley and J. P. Smith went through this band with the head herder, and "looked them over," after which, taking the head herder with them, they proceeded to the second band, some 10 or 12 miles further on. In company with the head herder, they went through this band also; Beasley informing plaintiffs agent that this "was the balance of the bunch of sheep." Upon their return to the first band, Beasley and the two Smiths again went through the sheep, and Beasley stated to J. P. Smith that he turned over all his interest in said sheep to him as plaintiff's agent, and requested him to take charge of them. The latter informed the chief herder that he' had ordered cars to ship the sheep. He testified: "I told him to take good care of the sheep, and do as he had been doing before, and bring them to the railroad, and I was going to ship them." It is satisfactorily shown that the chief herder assented to the directions and instructions thus given to him by plaintiff's agent in the presence of W. W. Beasley, and undertook and agreed to carry them into execution. Beasley, J. P. Smith, and Knigge returned late in the evening to Dickinson. On the following morning, viz: August 7th, the papers in the attachment suit were served on Beasley in Dickinson, and the sheep were taken possession of by the defendant during the forenoon. The testimony of the chief herder shows that the first band had been moved some distance towards Dickinson since the evening of the preceding day, and it appears to our satisfaction that this was done in pursuance of the directions of plaintiff's agent before referred to. It does not appear that the herders Tetters and Hodges participated in or heard the conversations which occurred on Sunday, or received any instructions either from Beasley or J. P. Smith. Neither does it appear that the sheep in the second band had been moved when the defendant levied upon them. The only person in the immediate custody of the sheep who directly participated in the alleged "turning over" was Charles W. Smith.

In our judgment, the following facts are satisfactorily established: First, that plaintiff's manager obtained Exhibit 82 for the purpose of making plaintiff's right of possession absolute; second, that he then ordered cars for making immediate shipment of the sheep; third, that he then went to the sheep camps for the special purpose of taking actual possession and control of the sheep for plaintiffs; fourth, that he arranged with Smith, the chief herder, who was in general charge of the two camps, to bring the sheep to Dickinson; fifth, that said Smith proceeded to carry out such arrangement, and

had moved the first band some distance, pursuant to such directions, when they were seized by defendant. Do these facts show such possession and control of the sheep as will sustain a factor's lien thereon? We are of opinion that they do. Our views as to the character of the possession required to sustain the lien were partially expressed by the late Chief Justice Bartholomew in *Rosenbaum* v. *Hayes*, 8 N. D. 472, 473, 79 N. W. 992, in the following language: "We have said that the factor's possession must be exclusive, but that does not mean that it must be actual and personal. Delivery by the owner to any person for the factor enables the factor's lien to attach at once, whether the delivery be to a common carrier, ship-owner, warehouseman, or agent. 1 Jones, Liens, § 460. And the delivery may be constructive as well as actual. 'It is only necessary that the goods should be so appropriated to the factor that they are assuredly under his control.' * * * A factor's lien depends upon the fact of possession, and not the appearance. Rev. Codes, § 4836. Our statute is like that of New York, and there it is held that possession means such control of or dominion over merchandise as enables a factor rightfully to take it into actual custody without the aid of any new authority or document furnished by the owner. *Pegram* v. *Carson*, 10 Bosw. 505. The rule as between vendee and creditor has been stated by this court as follows: 'What the law requires, and all the law requires, is that the conduct of the parties should clearly show a relinquishment of ownership and possession, and all right of control on the part of the vendor, and an assumption of ownership, possession, and control on the part of the vendee. *Morrison* v. *Oium*, 3 N. D. 76, 54 N. W. Rep. 288. How stood the parties under the evidence? That the Beasleys had surrendered all legal right to possession and control must be conceded. We think it must also be conceded that, the Beasleys having surrendered the right of possession and control to plaintiffs, they had the legal right to take the property into actual custody, without the aid of any new authority or document from the Beasleys. * * * We have endeavored to show that the matter of visible change does not apply in this case, or in this state. As between a vendee and an at.aching creditor, an entire want of change of possession would not be conclusive as against the vendee. Rev. Codes, § 5053. A factor is in a worse position than a vendee, in that his lien depends upon possession; but, so far as visible appearances are concerned, he should be in no worse position, and the bona fides as between the Beasleys and plaintiffs cannot be questioned on this record." In the case at bar the fact of possession depends, not upon a delivery to a third person for the factor, but upon an actual delivery of possession by the owner directly to the factor.

It certainly cannot be claimed that the change of possession necessary to sustain a factor's lien must be of a more open and decisive character than is required in a sale of personal ·property, and it would seem that a transfer of possession which would be good as

against attaching creditors of a vendor would be sufficient to sustain a factor's lien. No rule has been, or, in the nature of things, can be, formulated, which will universally determine what particular facts will constitute a change of possession such as the law requires. Necessarily, each case must turn upon its own facts. As was said by *Collins,* J., in *Tunnell* v. *Larson,* 39 Minn. 269, 39 N. W. 628: Precisely what constitutes a delivery and change of possession must depend largely upon the kind and nature of the chattels, the situation of the parties, and other cicumstances peculiar to each case. No arbitrary test or rule can be laid down." In *Dodge* v. *Jones,* 7 Mont. 121, 14 Pac. 707, it was said that: "No particular act or formal ceremony is necessary to make a delivery in law. Any act done, coupled with the intent to change the ownership, which has the effect to transfer the dominion over the thing sold to the buyer is a delivery." This was a case of a sale of range horses. They were brought in and branded with the vendee's brand, and then turned back on the range. This was held a sufficient delivery. The court said: "What more could have been done to constitute a delivery? The law does not require a proclamation of delivery to be made, nor that these horses should be temporarily separated from the others, or put in a corral or inclosure. All that was necessary to be done was done. There was a permanent identification of these horses, and the relations of the parties to these horses were changed." In *Potter* v. *Bucher,* 98 Cal. 454, 33 Pac. 335, that court said that, "in the determination of the question as to the kind of possession necessary to be given in order to make a sale of personal property valid as against creditors, regard must be had not only to the caracter of the property, but also to the nature of the transaction, the position of the parties, and the intended use of the property. The law only requires that which could naturally be done in an honest and business-like transaction, where there was no thought of fraud or concealment." The above was a case of sale of cattle and horses by a husband to his wife, where the property continued on the farm after the sale. The facts peculiar to that case were held sufficient to establish a change of possession. *Cady* v. *Zimmerman,* 20 Mont. 225, 50 Pac. 553, involved a sale of sheep where the vendee merely branded them with his brand, and arranged with the vendor to keep them for him. The delivery was held sufficient as against an attaching creditor of the vendor, and the language of the Montana and California courts above quoted was expressly approved. In *Long* v. *Knapp,* 54 Pa. 514, it was held that the law only requires such a delivery and change of possession as the nature of the property will allow; further, that, while "creditors are justly entitled to protection against secret alienations and frauds, there is a limit, and many cases show it, where legal presumptions must not overturn honest sales and fair dealing." In *Montgomery* v. *Hunt,* 5 Cal. 366, a vendor of cattle gave the vendee an order for them on his agent at his ranch. "The agent pointed out the cattle as they were grazing in

view, and told the purchaser that he delivered him possession, and then accepted an offer of employment from him, and remained in charge of them until seized by the sheriff as the property of the vendor. It was held that "this was a delivery as immediate and complete as the nature of the case would admit and followed by an actual and continued change of possession." The following cases are cited as showing the variety of facts, many of them similar to the case at bar, which have been held to constitute a sufficient change of possession: *Williams* v. *Lerch,* 56 Cal. 330; *Morgan* v. *Miller,* 62 Cal. 492; *O'Brien* v, *Ballou,* 116 Cal. 318, 48 Pac. 130; *Williams* v. *Borgwardt,* 119 Cal. 80, 51 Pac. 15. And the employment of the vendor to keep and care for property after a sale is not absolutely incompatible with a change of possession. As was said in *Godchaux* v. *Mulford,* 26 Cal. 316, 85 Am. Dec. 178: "A hired clerk or salesman is no more in the possession of the goods of his employer than a hired laborer is in possession of the farm on which he works. The employment of the vendor in a subordinate capacity is colorable only, and not conclusive upon the question as to whether there has been an immediate delivery and actual change of possession. He cannot be allowed to remain in the apparent sole and exclusive possession of the goods after the sale, for that would be inconsistent with such an open and notorious delivery and actual delivery as the statute exacts in order to exclude from the transaction the idea of fraud. But if it be apparent to all the world that he has ceased to be the principal in the charge and management of the concern, and becomes only a subordinate or clerk, the reason of the rule announced in the statute is satisfied. The immediate delivery and actual and continual change of possession are the ultimate facts by which, according as they are present or absent, the statute determines the legal character of the sale." For cases holding that a vendor may under some circumstances hold possession for his vendee after sale and delivery, see *Adams* v. *Weaver,* 117 Cal. 42, 48 Pac. 972; *Humphreys* v. *Harkey,* 59 Cal. 626; *Parks* v. *Barney,* 55, Cal. 239; *Clute* v. *Steele,* 6 Nev. 335; *O'Brien* v. *Ballou,* supra. Under the strictest rule of the foregoing cases, we think the possession of the plaintiffs was amply sufficient. It was as open as circumstances would permit, and there was no concealment. Nor do we attach much importance to the fact that the herders, Tetters and Hodges, were not informed of the transfer. It was not necessary. Charles W. Smith was in general charge of the camp, and had been for four months, and it would have been an idle ceremony to specially inform them of the transfer, when the fact was openly made known to the chief herder. Neither do we deem it important that plaintiff's manager did not make definite contracts for the services of the herders when he took possession. Our inquiry is not as to the particular contractual relations existing between the herders and Beasleys after the change of possession on Sunday, but it is merely as to the fact of the possession and control thereafter and at the date

of the seizure. Beasley & Co. transferred all right of possession to plaintiffs when they executed and delivered Exhibit 82. After that date they could assert no lawful right of possession. Neither could their agents or servants. Neither did they attempt to do so. On the contrary, W. W. Beasley went to the camps, and in the presence of the chief herder disclaimed any further possession or right of possession, and the same was in fact assumed by the plaintiff's agent. Plaintiff's complete dominion and control of the sheep is sufficiently shown by proof that it was their orders which were being executed through the chief herder at all times after the turning over on Sunday.

But it is claimed that no effect can be given to the delivery on the prairie because it occurred on Sunday. It is contended that it comes within the terms "servile labor" and "trade," prohibited by § § 6841, 6842, Rev. Codes. This claim is without merit. As we have seen, the plaintiff's right of possession was complete when they received Exhibit 82. Their agent, when he visited the sheep camps on Sunday, needed no new authority to entitle him to possession. He was merely asserting a right which he had acquired on a secular day. But if it were assumed that the transaction stands on the same footing as a Sunday sale and delivery of the sheep, and that it was an unlawful act,—a point which we are not called upon to decide,—yet it would avail defendant in no way. The inquiry which the law makes is merely as to the situation of the property at the time of the seizure, not as to the means by which it came into the status in which it was found. In cases of Sunday sales, where held unlawful, the law refuses to interfere to aid either the vendor or the vendee. It leaves them, so far as the transaction is executed, just where their unlawful acts have placed them. For this reason it will not aid a vendor to retake the possession of property with which he has parted on a Sunday sale. *Smith* v. *Bean,* 15 N. H. 577; *Kinney* v. *McDermott,* (Ia.) 8 N. W. 656; *Myers* v. *Meinrath,* 101 Mass. 366, 3 Am. Rep. 368; *Cranson* v. *Goss,* 107 Mass. 439, 9 Am. Rep. 45; *King* v. *Green,* 6 Allen, 139. The law says to both parties: "This transaction was a violation of the statute. Both of you are equally guilty, and each of you must remain in the position in which you have placed yourselves." *Block* v. *McMurry,* 56 Miss. 217, 31 Am. Rep. 357. Neither can an attaching creditor of the vendor assert a right of possession which is denied to the vendor. *Horton* v. *Buffington,* 105 Mass. 399; *Smith* v. *Bean,* supra; *Chestnut* v. *Harbaugh,* 78 Pa. 473. The rule of law is absolute nonaction. "It will give neither party to the contract any assistance, nor listen to any complaint. It will leave the parties where it finds them." And it applies to the attaching creditor of the vendor. *Foster* v. *Wooten,* (Miss.) 7 South. 701. See, also, *Greene* v. *Godfrey,* 44 Me. 25, and *Jameson* v. *Carpenter,* (N. H.) 36 Atl. 554. On the subject of Sunday sales, see *Ward* v. *Ward,* (Minn.) 77 N. W. Rep. 965.

It is claimed by defendant that in any event the plaintiffs thereafter

lost their lien. The first claim is that it was waived by taking mortgage security for the indebtedness secured by the lien. It appears that after executing Exhibit 82 George M. Beasley went to Chicago and endeavored to meet Joseph Rosenbaum, but was not able to find him. He then went to the office of one A. B. Melville, an attorney at law in that city, and there executed, unler date of August 7, 1893, four mortgages in favor of plaintiffs: One was a real estate mortgage on lands located in Stutsman county, this state. Two were duplicate chattel mortgages on property situated at Rosebud, Mont. The fourth was a chattel mortgage on the sheep in suit. All of said mortgages were mailed for record. The chattel mortgage on the sheep was recalled by wire before it was filed. The value of the property covered by the Stutsman county mortgage and the Montana chattel mortgage is shown to be about $2,500. The real-estate mortgage contained this clause: "And the said (George M. Beasley & Co.) hereby covenant and agree to and with Rosenbaum Bros. & Co. that they will pay all of the indebtedness above described within one year from this date, and will pay any future indebtedness which may be incurred from the firm of George M. Beasley & Co. to the firm of Rosenbaum Bros. & Co. within one year from this date, and in default of such payment [then follows a power of sale.]" Plaintiffs strenuously claim that the execution of these mortgages was a voluntary act on the part of Beasley, done without their knowledge, solicitation, or approval, and that they expressly repudiated any acceptance or reliance thereon as soon as they became aware of their execution. They further disclaim any authority in A. B. Melville to act for them, and endeavor to show that Melville was acting entirely for the Beasleys. Such is the testimony of Joseph Rosenbaum, and the testimony of A. B. Melville and George M. Beasley is to the same effect. Notwithstanding the harmony which exists in the testimony of these three witnesses on the question of plaintiff's ignorance of and nonparticipation in the giving of the mortgages, we are not convinced that the transaction was wholly unauthorized by plaintiffs. We shall therefore treat the transaction as one in which the plaintiffs participated. The question then is presented whether the giving and acceptance of these mortgages, on the facts of this case, operate to forfeit plaintiff's lien. Counsel for defendant claim that it had such effect, and in support of their contention rely entirely upon the rule laid down in 1 Jones, Liens, § 1002, which is that: "There can be no lien at common law or by usage where the parties make a special agreement inconsistent with a lien, either for a particular mode of payment, or for a payment at a future particular time, although without such agreement the right to a lien would be implied or recognized. If such agreement is antecedent to the possession, no lien is created. If it is made afterwards, the lien is waived." The authorities cited by the author in support of the rule as above formulated are cases where the lienor had stipulated for payment at a time beyond that at which the lien would naturally terminate. (*Pinney* v. *Wells*, 10 Conn. 103; *Chandler* v. *Belden*, 18

Johns. 157, 9 Am. Dec. 193; *Lee* v. *Gould,* 47 Pa. 398), or had agreed
to look to his debtor personally (*Pullis* v. *Sanborn,* 52 Pa. 368;
*Bailey* v. *Adams,* 14 Wend. 202), or where the facts showed an inten-
tion not to rely upon the lien (*Darlington* v. *Chamberlain,* 20 Ill.
App. 443.) No claim is made, or can be made, upon the evidence
in the record, that the plaintiffs at any time relied upon the per-
sonal responsibility of the Beasleys for payment of their advances.
If, therefore, their lien was waived, the waiver must have resulted
from an intent to waive it, actual or implied, or by reason of an ex-
tension of time of payment of the debt secured, inconsistent with the
continuance of the lien. The burden of showing a waiver is upon
the party asserting it. *Cordova* v. *Hood,* 17 Wall. 1, 21 L. Ed. 587;
*Gold Mines* v. *Seymour,* 153 U. S. 509, 14 Sup. Ct. 842, 38 L. Ed.
802; Story, Eq. Jur. § § 1224, 1225; *Brisco* v. *Mining Co., (C. C.)*
82 Fed. 952. And the law is not anxious to imply a waiver.  *  *  *
The taking of a mortgage upon the same property upon which the
creditor claims a statutory lien may not displace the lien. The mort-
gage is regarded as cumulative security, and the creditor may enforce
either the lien or the mortgage. So, also, the taking of the collat-
eral obligation of another person for the payment of a lien does not
ordinarily debar the lienholder from claiming the security of his lien,
unless the circumstances are such that an intention to waive the lien
can be reasonably inferred." *Payne* v. *Wilson,* 74 N. Y. 348. The
rule which appeals to us as voicing the doctrine of the authorities
is laid down in Jones, Liens, § 1011, in this language: "The mere
taking of security for the amount of a debt for which a lien is
claimed does not ordinarily destroy the lien. To have that effect,
there must be something in the facts of the case or the nature of the
security generally which is inconsistent with the existence of the lien,
and destructive of it." In *Slide* v. *Seymour,* supra, Mr. Justice
Brewer said: "An intent to abandon it is not to be presumed, and
while, of course, like any other right, it may be abandoned or waived,
the evidence to so abandon or waive should be clear and satisfactory.
2 Story, Eq. Jur. § 226, and cases cited in notes. In *Cordova* v.
*Hood,* 17 Wall. 1, 21 L. Ed. 587, it was held that, while the taking
of security may raise a presumption of a waiver of a lien, it is a pre-
sumption which is open to rebuttal. In 2 Story, Eq. Jur. § 1224,
the author says that "if, under all the circumstances, the waiver re-
mains in doubt, then the lien attaches.'" See, also, 28 Am. & Eng.
Enc. Law, 526; *Kilpatrick* v. *Railway Co.,* (Neb.) 57 N. W. 664;
*Ford* v. *Wilson,* (Ga.) 11 S. E. 559; *Chicago & A. R. Co.* v. *Union
Rolling-Mill Co.,* 109 U. S. 702, 3 Sup. Ct. 594, 27 L. Ed. 1081;
*Howe* v. *Kindred,* (Minn.) 44 N. W. 311. The prevailing rule un-
doubtedly is that: "One will not be held to have waived a lien unless
the intent be expressed or very plain and clear. The presumption is
always against it." See *Lambert* v. *Nicklass,* (W. Va.) 31 S. E.
951. This court has expressly held that the taking of a mortgage
upon property upon which a statutory lien is claimed does not of it-

self operate to forfeit the lien. *Joslyn* v. *Smith,* 2 N. D. 53, 49 N. W. 382. In that case a chattel mortgage had been given to secure a debt also secured by a seed lien. The court, in the course of its opinion, in discussing the question whether the taking of a mortgage waived the lien, said: "It has sometimes been so held, but only when the security taken, or length of time given for payment, was entirely inconsistent with the idea of relying upon or enforcing a lien, and manifested an intent to waive it. The question of waiver is a question of intent, and, where the law raises a presumption of waiver from the act of the party in taking security, such presumption may be overcome by evidence aliunde." See cases cited in 2 N. D. 56, 49 N. W. Rep. 383. Do the facts of this case show an intent to waive the factor's lien? Most clearly they do not. Aside from the doubt which exists as to plaintiff's connection with the taking of the mortgages, the fact is shown that they were speedily rejected by them. Besides, at the very time the mortgages were given, plaintiffs were actually engaged in strengthening their factor's lien, and strenuously relying upon it, through their agent, J. P. Smith, at Dickinson. There are no facts showing an actual intent to waive it. The evidence, on the other hand, shows the contrary. Neither are we at liberty to infer a waiver on the facts. The mortgage security given was insignificant in value, as compared with the value of the sheep covered by their factor's lien, and forbids such inference. Neither was the time of payment of the debt secured by the factor's lien in fact extended by plaintiffs. The parties themselves disclaim any such intention or agreement. The only evidence relied upon is the mortgages, wherein it appears that Beasleys agreed to pay the debt within a year thereafter, with the condition that, if such payment was not so made as there promised, the mortgage might be foreclosed. These mortgages, as we have seen, were merely additional security, and the promise to pay was a collateral promise, and not a novation of the original debt. The form of the old debt was not changed. The rule applicable is concisely stated in *Fisher* v. *Bank,* (Colo. Sup.) 45 Pac. Rep. 440 by *Campbell,* J., in the following language: "We think it the safer rule, and the one resting upon principle, and so hold, that the mere taking of collateral security, whether it be a note or mortgage, or both, and payable or enforceable after the maturity of the original debt, is not of itself *prima facie* evidence of an extension of the time of payment of the original debt." The question as to the effect of a promise in a mortgage securing the payment of a debt which was then due, at a period six months thereafter, was before the United States Supreme Court, in *U. S.* v. *Hodge,* 6 How. 279. 12 L. Ed. 437, and it was held that the provisions of the mortgage did not extend the time of payment of the original debt or prevent its enforcement. Resort to the mortgage security, however, could not be had except according to its terms. To the same effect is *Cary* v. *White,* 52 N. Y. 138; *Gordon* v. *Bank,* 144 U. S. 97, 12 Sup. Ct. 657, 36 L. Ed. 360.

*Brengle* v. *Bushey,* 40 Md. 141, 17 Am. Rep. 586, is a case directly in point. The court said: "It is well settled that the acceptance of a security of a higher nature in lieu of or in satisfaction of one of an inferior nature operates as an extinguishment of the latter; but, where such security is accepted merely as additional or collateral security of a pre-existing debt, it is equally clear that the doctrine of extinguishment or merger does not apply. * * * Where a mortgage is taken as collateral security for a pre-existing debt, the current of authorities holds that in the absence of an express provision in the mortgage to that effect, or proof aliunde to show that such was the intention of the parties, the mortgage will not suspend the remedy on the old indebtedness." See, also, *Benton* v. *Bank,* (Neb.) 64 N. W. 227; *Elwood* v. *Deifendorf,* 5 Barb. 398; *Bank* v. *Ives,* 17 Wend. 501; *Shaw* v. *First Associated Reformed Presbyterian Church,* 39 Pa. 226.

It is also urged by defendant's counsel that "the claim of the plaintiffs against the Beasleys has been assigned, and any lien is extinguished." The point is made by defendant's counsel that a factor's lien or right to a lien cannot be assigned, and authorities are cited in support of that position. See Jones, Liens, § 982 et seq. The question of the assignability of the lien we need not discuss or determine. It is not involved on the facts as they exist in this case, as will appear by a brief reference thereto. The claim that the lien was assigned is based entirely upon the testimony of Joseph Rosenbaum. In his deposition taken November 4, 1899, upon cross-examination by defendant's counsel, he testified that the business of the plaintiff co-partnership was transferred on January 1, 1894, to a corporation of the same name, and that "all the claims and accounts of the partnership were turned over to the company," and on redirect examination that the partnership guaranteed all accounts and bills receivable to the corporation; further, that "the partnership of Rosenbaum Bros. & Co. was not dissolved then nor since, as we are still doing part of our business under the partnership." On November 10, 1899, his testimony was taken by plaintiffs in a second deposition, with special reference to this assignment; and he expressly states that "when the corporation was formed the matter in litigation in this case was left just as it was," and that "the partnership of Rosenbaum Bros. & Co. has never made any transfer or assignment of any of the matters, accounts, or claims in litigation in this action." Counsel for defendant ask us to believe that when this witness testified on November 4th, not having in mind the question of the assignment of matters in litigation, and his attention not being called to it, he testified truthfully, but that his testimony six days later, specially directed to that question, is wholly false. We do not so interpret the testimony. His specific declaration of November 10th that matters in suit were not assigned is not fairly in conflict with his general statement of November 4th that "all claims and accounts" were turned over; for the latter would not necessarily, and ordinarily would not, include

mere causes of action and pending suits which would not appear upon the books of the co-partnership. If any credence is to be given to this witness, the fact is established that there was no assignment. The belief that it was not assigned is somewhat strengthened by the fact that it does not appear that the corporation to which it is alleged it was assigned has made any claim or demand thereon, although more than seven years have passed since the date of the alleged assignment, which certainly is unaccountable, considering the amount of the claim. But if we are mistaken in this, and the account against Beasleys was assigned, the result is the same; for, clearly, there was no assignment of the lien, as will appear by a brief reference to the facts. The sheep were taken from the defendant by the coroner on August 11, 1893. On August 13, 1893, defendant rebonded and retook possession. On November 20, 1893, he sold the sheep under an order of court which he had procured for that purpose. The alleged assignment of the claim did not occur until January 1, 1894, if at all. What was there to assign at that date? A factor's lien, or right to a lien? Clearly not. There existed at that time the account against Beasley & Co. and the present cause of action against the defendant Hayes, and nothing more. The act of the defendant in executing the undertaking and retaking the sheep fixed the rights of the parties, so far as any further legal right of possession of the sheep was concerned. Thereafter the plaintiffs had no legal claim to the possession of the sheep. The plaintiffs only claimed a lien, and the defendant, by his rebonding, had become possessed of the legal right to sell the sheep and transfer the title. See *Union Nat. Bank v. Moline, Milburn & Stoddard Co.,* 7 N. D. 201, 219, 73 N. W. Rep. 527. This power was exercised by him, as we have seen, on November 20th; and he therefore no longer had it in his power to restore possession to plaintiffs, had he desired to do so. This was the condition when it is asserted that the "claim against the Beasleys was. assigned." At this time the lien was entirely merged in the present cause of action, and had no independent existence. Furthermore, an assignment of plaintiff's account against Beasleys (and that is all that is claimed) is a far different thing from an assignment of plaintiff's cause of action against defendant, Hayes. But, even if the cause of action was assigned to the corporation by the plaintiffs, it is properly continued in the name of the original party; no application for substitution having been made. See § 5234, Rev. Codes.

The trial court found the balance due plaintiffs on August 7, 1893, was, $16,163.07. This finding is challenged by appellant. It is insisted that the sum then due did not exceed the sum of $12,496.69. Both amounts are based upon the testimony of Joseph Rosenbaum. The discrepancy in the amounts is between the general balance of account to which he testified, and the sum obtained by an addition of what purports to be the items of which the account is composed. In his deposition given February 5, 1894, and in another given on March 31, 1894, he gave in detail various items of receipts.

from and advancements to the Beasleys, which items were taken from the firm books then before him. On November 16, 1894, in a third deposition, he testified that the amount due the plaintiffs from Beasley & Co. on August 7, 1893, was $15,603.07, with interest, being interest on a $10,000 note dated November 28, 1892, which represented part of the indebtedness, making the sum then due $16,156.38,—the amount named in the complaint and found by the trial court It appears that at no time was the witness able to state the items of the account from memory, and did not undertake to do so. On his last examination he produced all books containing the accounts of the dealings of the firm with Beasley & Co., and testified to the balance as above stated and found by the trial court. Under the circumstances, we are compelled to agree with the finding of the trial court. The witness was not asked to state each and every item of the account; neither was he asked whether the items he enumerated composed all that appeared on the books; neither was his attention called to any apparent discrepancy between the total of the items given and the general balance claimed, all of which could easily have been demonstrated by the books upon which his testimony was based, if in fact the balance as stated was erroneous. Later, as we have seen, the books were again produced, but no attempt was made by counsel for defendant to impeach the balance as stated by the witness by the books, which were open to them for that purpose. Upon this state of facts, we are compelled, in fairness, to accept the balance as testified to by the witness as the amount actually due when the sheep were seized, and so find. It follows from what we have said that the judgment of the District Court must be in all things affirmed.

In conclusion, the members of this court wish to acknowledge their indebtedness to counsel for both parties for invaluable assistance derived from their able and carefully prepared briefs, both upon questions of law and fact. They have materially lightened our labor in considering the questions involved in an exceedingly voluminous and intricate record. Judgment affirmed. All concur.